SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-05-0162-AP |
| Appellee, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No. CR1999-015293 |
| EUGENE ROBERT TUCKER, | ) |
| | ) |
| Appellant. | ) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Jeffrey A. Hotham, Judge

**AFFIRMED**

_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                Phoenix
      By   Kent E. Cattani, Chief Counsel
           Jeffrey A. Zick, Assistant Attorney General
           Capital Litigation Section
Attorneys for the State of Arizona


JAMES J. HAAS, MARICOPA COUNTY PUBLIC DEFENDER         Phoenix
      By   Christopher V. Johns, Deputy Public Defender
           Karen Noble, Deputy Public Defender
Attorneys for Eugene Robert Tucker

_____

**B A L E S,** Justice

¶1      This automatic appeal is from a jury's determination that Eugene Robert Tucker should receive death sentences for three murders.  We have jurisdiction pursuant to Article 6, Section 5(3), of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") section 13-4031 (2001).

## I.  Factual and Procedural Background[1]

¶2      On July 15, 1999, ten days after he turned eighteen, Tucker entered an apartment occupied by Ann Marie Merchant, a woman with whom he had a prior sexual relationship.  Also living at the apartment were Ann Marie's brother, Roscoe Merchant; Roscoe's girlfriend, Cindy Richards; and Cindy's infant son, Anothy.  Tucker bound, gagged, strangled, beat, sexually assaulted, and shot Ann Marie.  He shot and killed Cindy and Roscoe as they slept in their bed; he left the infant alive in a crib in the same room.

¶3      In 2000, Tucker was tried and convicted of sexual assault, kidnapping, burglary, and three counts of first degree murder for the deaths of Ann Marie, Roscoe, and Cindy.  The trial judge sentenced Tucker to twenty-five years to life for sexual assault, twenty-one years for kidnapping, twenty-one years for burglary, and death for each of the murders.

¶4      In 2003, the Court affirmed the convictions and sentences for the non-capital offenses and affirmed the murder convictions.  *State v. Tucker* (*Tucker I*), 205 Ariz. 157, 170 ¶ 69, 68 P.3d 110, 123 (2003).  Pursuant to *State v. Ring* (*Ring III*), 204 Ariz. 534, 555 ¶ 53, 65 P.3d 915, 936 (2003), the

---

[1]     On appeal, the Court views the facts in the "light most favorable to sustaining the verdict."  *State v. Tucker* (*Tucker I*), 205 Ariz. 157, 160 n.1, 68 P.3d 110, 113 n.1 (2003).  A more complete account of the crimes and the first trial appears in *Tucker I*.  *Id.* at 160-61 ¶¶ 1-18, 68 P.3d at 113-14.

Court considered whether it was harmless error for the trial court, rather than a jury, to have found the aggravating factors and to have determined that death sentences were appropriate. *Tucker I*, 205 Ariz. at 167 ¶ 54, 68 P.3d at 120. The Court concluded that the findings of the A.R.S. § 13-703(F)(6) (Supp. 1999) aggravator based on cruelty for the death of Ann Marie and the § 13-703(F)(8) multiple murders aggravator for each victim constituted harmless error. *Tucker I*, 205 Ariz. at 169 ¶¶ 62, 66, 68 P.3d at 122. Resentencing was required, however, because the Court concluded that a reasonable jury could reach different conclusions than had the trial court with regard to the § 13-703(F)(6) aggravator for Roscoe and Cindy, which was based on a witness-elimination theory; the § 13-703(F)(3) aggravator, which was based on a theory that Tucker had placed the infant in "grave risk of death" by leaving him in the apartment after killing all the adult occupants; and the significance of the mitigating circumstances. *Id.* at 169-70 ¶ 68, 68 P.3d at 122-23.

¶5 On remand, a newly impaneled jury sentenced Tucker to death for each of the murders after finding four aggravating circumstances for each victim: (1) conviction of another offense eligible for life imprisonment or death; (2) grave risk of death to another person; (3) especially heinous, cruel, or depraved; and (4) conviction of one or more other homicides

3

during the commission of the offense.

## II. Aggravation Phase Issues

### A. Right to Testify

¶6       Tucker contends that the trial judge interfered with his right to testify at the aggravation phase and failed to secure a knowing, voluntary, and intelligent waiver of that right.  He also argues that the judge's comments prevented the jury from considering mitigation evidence.  Because Tucker did not object at trial, we review for fundamental error.  *State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005).

¶7       Tucker testified during the first trial and denied committing the murders.  *See Tucker I*, 205 Ariz. at 161 ¶¶ 16-17, 68 P.3d at 114.  During the resentencing aggravation phase, Tucker's counsel told the trial judge that he and Tucker had discussed, in "very precise and in-depth conversations," whether Tucker would testify.  Counsel opined that Tucker was "very clear" about his right.  He confirmed that if Tucker decided to testify, Tucker would do so in the penalty phase.

¶8       The trial judge advised Tucker that he had a constitutional right to testify and that he should consider his lawyer's advice when making his decision.  He also cautioned that if Tucker chose to testify, the State could cross-examine him about information that may not present him in a positive light and introduce witnesses to rebut his testimony.  The trial

4

judge told Tucker that, in his opinion, such rebuttal evidence would make Tucker "look very bad" and reveal to the jury information that his lawyer did not want disclosed.

¶9 During the penalty phase, the trial judge again advised Tucker of his right to testify and asked if his comments had coerced or impaired Tucker's decision. In response, Tucker stated: "Not at all, Your Honor. I choose to remain silent. . . . With all due respect to you and to your court, Your Honor, it has nothing to do with you."

¶10 The record confirms that Tucker understood and voluntarily relinquished his right to testify. The trial judge's comments simply informed Tucker of the consequences of testifying. Moreover, Tucker cannot complain that the judge's comments prevented the jury from hearing mitigation evidence during the aggravation phase. Such evidence is not proper at this phase of a capital sentencing proceeding. *See State v. Anderson* (*Anderson II*), 210 Ariz. 327, 348 ¶ 86, 111 P.3d 369, 390 (2005) ("The only issue at the aggravation phase is whether any aggravating circumstances have been proved . . . .").

## B. Juror Challenge

¶11 Tucker contends that the trial judge improperly dismissed prospective Juror 147 off the record and excluded this juror based on her general opposition to the death penalty. We review Tucker's claim for fundamental error because Tucker did

5

not object to the juror's dismissal. *State v. Roseberry*, 210 Ariz. 360, 366 ¶ 26, 111 P.3d 402, 408 (2005), *cert. denied*, 126 S. Ct. 444 (2005).

¶12    Juror 147 was not improperly dismissed. Arizona Rule of Criminal Procedure 18.5(f) requires challenges for cause to "be of record," but that rule was not violated here. Nor does the record suggest that Juror 147 was excused because of her opposition to the death penalty.

¶13    During voir dire, Juror 147 described herself as an eighty-one year old cancer survivor and "walking miracle" who tired easily and who often "unknowingly" passed out. When asked about her health, she gave a rambling answer and then volunteered, "I have qualms about the death penalty, and yet I don't because, you know, the Lord said that if you use the sword you perish by the sword." The trial judge noted that the question concerned her health and asked if there was any health reason she could not sit as a juror. She replied, "No. I think that I can. I am going to go ahead with it, yes." Neither the prosecutor nor Tucker's counsel questioned Juror 147 further.

¶14    When the trial judge later reviewed the list of prospective jurors with counsel, there was an off-the-record discussion of Juror 147, and the judge then stated, on the record, that Juror 147 was being excused "by agreement of counsel." Rule 18.5(f) did not require the trial judge to make

6

a further record regarding the dismissal of this juror. Given that the record reflects that Juror 147 was dismissed by agreement of counsel, Tucker has not shown that she was excused because of her opposition to the death penalty or that her dismissal otherwise involved fundamental error.

## C. Stipulation

¶15 Tucker argues that the trial judge failed to properly instruct the jury regarding the parties' stipulation to Tucker's conviction of an offense for which a life sentence was imposable and improperly commented on the evidence. This stipulation provided the factual basis for the A.R.S. § 13-703(F)(1) aggravator. Because Tucker did not object to any aspect of the stipulation, we review for fundamental error. *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

¶16 During the aggravation phase, the trial judge read several stipulations to the jury, including one concerning Tucker's previous conviction. Before reading the stipulations, the judge instructed the jurors that the stipulations were facts agreed upon by the parties. He also told the jurors that they could consider these facts, but that the individual stipulations were not exhibits. The disputed stipulation stated: "On September 15, 2000, the defendant Eugene Robert Tucker was found guilty by a jury and convicted of the sexual assault of Ann Marie [Merchant]. . . . Under Arizona law, a sentence of life

7

imprisonment was imposable for this offense." After discussing whether the stipulation or the guilt-phase verdicts should be admitted as an exhibit, the judge told counsel that he would not admit the stipulation as an exhibit.

¶17    The trial judge properly instructed the jury on the significance of the stipulation. Moreover, the final aggravation phase instructions told the jurors that, for the (F)(1) aggravator, they had to find beyond a reasonable doubt that Tucker had been convicted of an offense for which a sentence of life imprisonment was imposable. Thus, the trial judge did not improperly instruct the jury to find the (F)(1) aggravator as a matter of law. The trial judge also did not improperly comment on the evidence by clarifying whether the stipulation should be admitted or whether the guilt-phase verdicts should be read to the jury. There was no error regarding the stipulation, much less fundamental error.

### D. Grave Risk of Death

### 1. Validity

¶18    Tucker argues that the (F)(3) aggravator is arbitrary and capricious because it renders him death eligible even though he is less culpable than a defendant who intended to harm a third party victim but is not death eligible. He therefore contends that this aggravator does not appropriately narrow the class of persons eligible for death. We review this issue de

8

novo.  *State v. Roque*, 213 Ariz. 193, 217 ¶ 89, 141 P.3d 368, 392 (2006).

¶19     We rejected a similar claim in *Roque*.  There we noted that the (F)(3) aggravator adequately distinguishes between those defendants who deserve the death penalty and those who do not because it "applies only if the defendant knowingly engaged in conduct that created a real and substantial risk of death to another person who, while not an intended target, was also not an unaffected bystander."  *Id.* at 218 ¶ 91, 141 P.3d at 393. The *Roque* jury instructions clarified the meaning of the (F)(3) aggravator by noting, in addition to the statutory language, that a third party's "mere presence" is not sufficient.  *Id.* ¶ 92.

¶20     Consistent with *Roque* and the statutory language, the trial judge instructed the jury that the (F)(3) aggravator requires proof that, "[i]n the commission of this offense, the defendant knowingly created a grave risk of death to another person or persons in addition to the person murdered during the commission of this offense."  Without objection by Tucker, the judge further clarified that the aggravator required the State to prove that the "third person was so close in proximity that there was a real and substantial likelihood that the third person might suffer fatal injuries[,] . . . the Defendant was aware of the risk to the third person[,] and . . . the Defendant

9

did not intend to kill the third person." Although the instructions did not include a statement that the "mere presence" of the third person is insufficient (a statement given in *Roque*), the instructions did not permit the jury to find the (F)(3) factor based on a person's presence as an unaffected bystander. The instructions therefore sufficiently narrowed the class of defendants eligible for death based on the (F)(3) aggravator.

## 2. Sufficiency of the Evidence

¶21     Tucker contends that there was insufficient evidence for the jury to find beyond a reasonable doubt that (1) the murderous act created a grave risk of death to Anothy; (2) he knowingly created such a risk; and (3) there was a "real and substantial likelihood" that the infant would be killed. We agree that the evidence was not sufficient because the infant was not in the zone of danger during Tucker's murderous acts, but we conclude that any error in submitting this aggravator to the jury was harmless.

¶22     At the close of the aggravation phase, Tucker asked the court to enter judgment that the State had not proved the (F)(3) aggravator. *See* Ariz. R. Crim. P. 20(a). The State conceded that the shots fired at Roscoe and Cindy did not themselves put Anothy at risk. Instead, the State argued that Tucker created a grave risk of death to Anothy because he knew

the infant was in the room and that he had killed Anothy's caretakers. The trial judge denied the Rule 20 motion.

¶23 The jury found the (F)(3) aggravator for each of the victims. After the penalty phase verdict, the trial judge gave the jury a special interrogatory to determine if it would still impose death without the (F)(3) aggravator. The jury affirmed each of the death sentences.

¶24 In addition to the requirements discussed in ¶¶ 19-20 *supra*, the (F)(3) aggravator requires the state to prove beyond a reasonable doubt that the "person who was not the intended victim was within the *zone of danger* created by the defendant's" murderous act. *Roque*, 213 Ariz. at 218 ¶ 94, 141 P.3d at 393 (emphasis added). In *State v. Carreon*, we clarified that the bystander must be subjected to the grave risk of death as a direct result of the defendant's "*murderous act.*" 210 Ariz. 54, 67 ¶ 63, 107 P.3d 900, 913 (2005) (emphasis added), *cert. denied*, 126 S. Ct. 122 (2005). There we found that the two children, who were not in the same room when the victim was killed, were not in the zone of danger. *Id.* ¶ 64. As in *Carreon*, Anothy was not in the same room as Ann Marie when she was killed, and there was no evidence that Anothy was otherwise in the zone of danger during Tucker's murderous acts upon Ann Marie.

¶25 Although Anothy's crib was within five or six feet of

11

Roscoe and Cindy's bed when they were killed, Tucker fired away from Anothy's crib when he shot Roscoe and Cindy. Anothy's mere presence in the room did not put him in the zone of danger because Tucker's murderous acts upon Roscoe and Cindy were aimed in the opposite direction.

¶26      Thus, the evidence was not sufficient to establish the (F)(3) aggravator for any of the murders, and we need not determine whether there was sufficient evidence of Tucker's mental state or a "real and substantial likelihood" that Anothy would be killed. Nonetheless, the error is harmless because the jury in the special interrogatory affirmed the death sentences without the (F)(3) aggravator. *See Henderson*, 210 Ariz. at 567 ¶ 18, 115 P.3d at 607 (stating that harmless error requires "the state to prove beyond a reasonable doubt that the error did not contribute to or affect the verdict or sentence").

### E. Heinous, Cruel, or Depraved

### 1. Validity

¶27      Tucker contends that the jury instructions on the (F)(6) aggravator were vague, incapable of principled application, and, as applied, arbitrary and capricious. Tucker objected on this basis during the aggravation phase. We review de novo whether jury instructions adequately state the law. *State v. Johnson*, 212 Ariz. 425, 431 ¶ 15, 133 P.3d 735, 741 (2006), *cert. denied*, 127 S. Ct. 559 (2006).

12

¶28     The (F)(6) aggravator is facially vague but may be remedied with appropriate narrowing instructions, whether a judge or a jury makes the sentencing determination. *State v. Ellison*, 213 Ariz. 116, 138 ¶ 96, 140 P.3d 899, 921 (2006), *cert. denied*, 127 S. Ct. 506 (2006).  We therefore must determine whether the instructions sufficiently narrowed the terms "especially heinous, cruel or depraved." *Id*.

### a. Especially Cruel

¶29     Tucker argues that the "especially cruel" instruction was deficient because it did not require "conclusive evidence" that the victim was conscious or experienced "significant uncertainty" about her ultimate fate.  He argues that it should have stated that "murder is especially cruel when there has been the infliction of pain and suffering in an especially wanton and insensitive or vindictive manner."  We have, however, approved instructions without such language.

¶30     The trial judge gave the following instruction on the "especially cruel" prong:

> Concerning this aggravating circumstance, all first-degree murders are to some extent heinous, cruel or depraved.  However, this aggravating circumstance cannot be found to exist unless the murder is *especially* heinous, cruel or depraved, that is, where the circumstances of the murder raise it above the norm of other first-degree murders.  "Especially" means beyond the norm, standing above or apart from others.

13

The terms "cruel", ["]heinous", or "depraved" are to be considered separately, but proof of any one of these factors is sufficient to establish this aggravating circumstance.

Cruelty involves the infliction of physical pain and/or mental anguish on a victim before death. A crime is committed in an especially cruel manner when a Defendant either intended or knew that the manner in which the crime is committed would cause the victim to experience physical pain and/or mental anguish before death. The victim must be conscious for at least some portion of the time when the pain and/or anguish was inflicted.

¶31    We have approved "especially cruel" narrowing instructions that required the jury to find that the victim was conscious during the mental anguish or physical pain and also that the defendant knew or should have known that the victim would suffer. *E.g.*, *Ellison*, 213 Ariz. at 139 ¶¶ 98-99, 140 P.3d at 922; *State v. Cromwell*, 211 Ariz. 181, 189 ¶ 42, 119 P.3d 448, 456 (2005), *cert. denied*, 126 S. Ct. 2291 (2006); *Anderson II*, 210 Ariz. at 352 n.19 ¶ 111, 111 P.3d at 394 n.19. Tucker's instructions contained these essential narrowing factors.

¶32    Although the court's instruction in *Anderson II* required "conclusive evidence" of consciousness, 210 Ariz. at 352 n.19 ¶ 111, 111 P.3d at 394 n.19, we have approved instructions on the meaning of cruelty that referenced a general consciousness requirement, *see Ellison*, 213 Ariz. at 138-39 ¶¶ 97-98, 140 P.3d at 921-22; *Cromwell*, 211 Ariz. at 189 ¶ 42, 119

14

P.3d at 456. We have also approved instructions that referenced "mental and physical anguish suffered by the victim," and did not require the victim's pain and suffering to be especially wanton and insensitive or vindictive. *Cromwell*, 211 Ariz. at 189 ¶ 42, 119 P.3d at 456.

¶33 Finally, a victim's significant uncertainty about his or her ultimate fate is one way in which the mental anguish aspect of the "especially cruel" prong can be fulfilled. *State v. Poyson*, 198 Ariz. 70, 78 ¶ 25, 7 P.3d 79, 87 (2000). Yet, our narrowing instructions require only that "the victim consciously experience[] physical or mental pain . . . and the defendant knew or should have known that" the victim would suffer. *Anderson II*, 210 Ariz. at 352 n.18 ¶ 109, 111 P.3d at 394 n.18 (quoting *State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997)). Tucker's instructions contained these essential narrowing factors and did not suffer from vagueness.

### b. Especially Heinous or Depraved

¶34 Tucker argues that the instructions failed to define gratuitous violence as violence "*clearly* beyond that necessary" to kill and to state that the heinous or depraved aggravator cannot be based solely on a finding of witness elimination. We reject these arguments.

¶35 The State focused on the gratuitous violence of Ann Marie's murder and the witness elimination aspect of Roscoe's

15

and Cindy's murders.  In addition to the general instructions on the (F)(6) aggravator, *supra* ¶ 30, the trial judge provided the following instruction:

> The terms "heinous" and "depraved" focus upon a Defendant's state of mind at the time of the offense, as reflected by his words and acts.  A murder is especially heinous if it is hatefully or shockingly evil; grossly bad.  A murder is especially depraved if it is marked by debasement, corruption, or perversion.  In order to find heinousness or depravity, you must find that the Defendant had such a mental state as exhibited by engaging in at least one of the following actions:

> 1.   Infliction of gratuitous violence on the victim;

> 2.   Killing to eliminate a witness of another crime[.]

> In this context, "gratuitous violence" refers to violence committed upon the victim beyond that necessary to kill.

> To assist you in determining whether the murder is heinous or depraved, you may consider whether:

> 1.   The murder was senseless; or

> 2.   Helplessness of the victim.

> All murders are "senseless" because of their brutality and finality.  Yet not all are senseless as the term is used to distinguish those first-degree murders that warrant a death sentence from those that do not.  Rather, a "senseless" murder is one that is unnecessary to achieve the Defendant's criminal purpose[.]

> "Helplessness" is proven when the victim is unable to resist.

> Neither "senselessness" nor "helplessness", [sic] standing alone, are sufficient to prove that this murder was heinous or depraved.

16

**¶36** The gratuitous violence instruction was consistent with our case law because it defined the term as violence beyond that necessary to kill. *E.g.*, *State v. Antoin Jones* (*Antoin Jones II*), 205 Ariz. 445, 449 ¶ 16, 72 P.3d 1264, 1268 (2003). Contrary to Tucker's argument, we have defined the term without the word "clearly." *E.g.*, *State v. Sansing*, 206 Ariz. 232, 237 ¶ 18, 77 P.3d 30, 35 (2003).

**¶37** The witness elimination instruction was also consistent with our case law because, while witness elimination alone is typically not sufficient to satisfy the heinous or depraved aggravator, "when a capital defendant eliminates the witness to a crime *other than the murder* to prevent that witness from testifying," witness elimination may, by itself, "justify a finding of heinousness or depravity." *Johnson*, 212 Ariz. at 439 ¶ 58, 133 P.3d at 749. Here, the State argued only that Roscoe and Cindy were killed to eliminate them as "witnesses of another crime."

## 2. Sufficiency of the Evidence

**¶38** Tucker argues that the evidence was not sufficient to prove beyond a reasonable doubt that Roscoe's and Cindy's murders involved witness elimination. We agree because there was no evidence that Roscoe or Cindy witnessed the attack upon Ann Marie.

**¶39** The Court considers six factors when determining

17

whether a defendant's acts are especially heinous or depraved: (1) relishing, (2) gratuitous violence, (3) mutilation, (4) senselessness of the crime, (5) helplessness of the victim, and (6) witness elimination. *State v. Ross*, 180 Ariz. 598, 605, 886 P.2d 1354, 1361 (1994). Witness elimination is a factor if (1) "the murder victim is a witness to some other crime, and is killed to prevent that person from testifying about the other crime"; (2) the defendant states that the motive for the murder is witness elimination; or (3) "extraordinary circumstances of the crime show, beyond a reasonable doubt, that witness elimination is a motive." *Johnson*, 212 Ariz. at 439 ¶ 57, 133 P.3d at 749 (quoting *Ross*, 188 Ariz. at 606, 886 P.2d at 1362). The first category of witness elimination, the only type alleged here by the State, is sufficient on its own to satisfy the heinous or depraved prong. *Id.* ¶ 58. The second and third types of witness elimination require an additional factor, such as senselessness or helplessness, to support a heinous or depraved finding. *See id.* ¶ 59.

¶40 We have not sustained the first type of witness elimination when there is no evidence that the victim witnessed another crime. For instance, in *State v. Danny Jones*, the defendant attacked three victims at a residence, one in the garage and two inside the residence. 185 Ariz. 471, 477, 917 P.2d 200, 206 (1996). We concluded that the case did "not fall

18

within the first category [of witness elimination] because there [was] no clear evidence of the sequence of the homicides." *Id.* at 488, 917 P.2d at 217. That is, we could not "determine conclusively" whether one victim inside the home witnessed the attack upon the other victim inside the home. *Id.*

¶41 Likewise, there was no evidence that either Roscoe or Cindy witnessed any part of the attack upon Ann Marie. Indeed, they were asleep when they were shot. Thus, there was not sufficient evidence to establish witness elimination for Roscoe's and Cindy's murders, and, as in *Danny Jones*, we leave open the question of whether the first category of witness elimination may be established when the "other crime . . . was committed before the murder at issue but . . . occurred during the same time period as the murder at issue, such as in a case involving multiple homicides," *id.* (internal quotations omitted).

## F. Double Jeopardy

¶42 Tucker contends that it violates double jeopardy for him to have been retried on the (F)(3) aggravator for all three victims and the (F)(6) aggravator for Roscoe's and Cindy's murders because in *Tucker I* the Court held that the evidence was insufficient for these aggravators. Tucker mischaracterizes our decision in *Tucker I*.

¶43 The Double Jeopardy Clause prevents a defendant from

19

being tried twice for the same offense.  U.S. Const. amend. V;
Ariz. Const. art. 2, § 10.   In *Ring III*, we rejected the
argument that resentencing a defendant under the amended capital
sentencing scheme violates double jeopardy.  204 Ariz. at 547-48
¶ 25, 65 P.3d at 928-29.  A defendant originally sentenced to
death may be resentenced to death on remand, even if the
evidence underlying the original aggravating circumstance was
insufficient.  *Id.* at 550 ¶ 36, 65 P.3d at 931.

¶44      In *Tucker I* we held that reasonable jurors could have
reached a different conclusion than had the trial court with
regard to the existence of the (F)(3) aggravator for each victim
and the (F)(6) aggravator for Roscoe's and Cindy's murders.  205
Ariz. at 169-70 ¶ 68, 68 P.3d at 122-23.  We did not hold that
insufficient evidence had been offered to support findings of
these aggravators.  *Id.*

### G. Photographs

¶45      Tucker contends that the trial judge committed
reversible error when he allowed the State, over Tucker's
objection, to admit a montage of forty-four photographs
discovered on Tucker's bedroom wall.  The photographs depicted
corpses and autopsies of deceased celebrities and historical
figures.  Some of the photographs also contained written
descriptions of the images.

¶46      We review a trial court's ruling on the admissibility

of evidence for an abuse of discretion. *State v. McGill*, 213 Ariz. 147, 154 ¶ 30, 140 P.3d 930, 937 (2006), *cert. denied*, 127 S. Ct. 1914 (2007). At trial, Tucker argued only that the photographs were irrelevant and did not object to the admission of any particular photograph. He now contends that they were inflammatory and prejudicial and argues that the written descriptions in certain photographs were inadmissible hearsay. Because Tucker did not raise these objections below, however, we review only for fundamental error. *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

¶**47** Pursuant to A.R.S. § 13-703(B) (Supp. 2004), the rules of evidence apply to the aggravation phase. Under Arizona Rule of Evidence 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Photographs may be relevant to aid the jury in resolving an issue of the case. *State v. Antoin Jones* (*Antoin Jones I*), 203 Ariz. 1, 10 ¶ 31, 49 P.3d 273, 282 (2002).

¶**48** Here, the State argued that the photographs were relevant to show the cruelty of Ann Marie's murder because some of them depicted "people who have bondage, handcuffs, and . . . [a] duct tape mask" and therefore they indicated that Tucker knew that the manner in which he killed Ann Marie would cause

her to suffer. The photographs, however, primarily depicted gunshot wounds, none of which particularly resembled Ann Marie's injuries; only one photograph contained a bound victim; and the commentary describing some of the images stated that the victims died instantaneously. Nonetheless, the photographs had some minimal relevance to the cruelty prong.

¶49 The State also argued that the photographs were relevant to prove the gratuitous violence of Ann Marie's murder because some depicted victims that were bound or gagged. Possession of photographs depicting gruesome, violent images of death may indicate that Tucker had some knowledge about the force required to kill Ann Marie. Although the photographs were seized more than one month after the murders and were not dated, the jury could have inferred that Tucker had displayed the photographs on his wall at the time of the murders.

¶50 Contrary to Tucker's argument, the written descriptions on the photographs did not constitute hearsay because the photographs and their commentary were not introduced to prove the truth of their contents, but rather to show what Tucker displayed on his bedroom wall. *See* Ariz. R. Evid. 801 (defining hearsay as "a statement . . . offered in evidence to prove the truth of the matter asserted").

¶51 Given the low threshold for relevance and Tucker's failure to object to the prejudicial nature of the photographs,

22

the judge did not abuse his discretion. In any event, any error in admitting the photographs was harmless because even without the photographs there was overwhelming evidence that Ann Marie's murder was "especially cruel," *see infra* ¶¶ 100-03. *Cf. State v. Spreitz*, 190 Ariz. 129, 142, 945 P.2d 1260, 1273 (1997) (stating that court need not remand if abuse of discretion in admitting photograph was harmless).

### H. Expert Testimony

¶52     Tucker contends that the trial judge admitted hearsay when he permitted the State's testifying materials expert to reveal the content of a non-testifying expert's statements. He also argues that this admission violates the Confrontation Clause under *Crawford v. Washington*, 541 U.S. 36 (2004). We reject these arguments because a testifying expert witness may, for the limited purpose of showing the basis of his or her opinion, reveal the substance of a non-testifying expert's statements. Such statements do not violate the Confrontation Clause because they are not admissible for their truth.

### 1. Facts

¶53     The State's materials expert, John Knell, testified that the duct tape used to gag Ann Marie was consistent with a roll of duct tape discovered at Tucker's home and a duct tape sheath found on a knife in Tucker's bedroom. During cross-examination, Tucker's counsel questioned Knell with the evident

goal of showing that many duct tape rolls are distributed. Tucker's counsel asked Knell whether he had "any idea how many rolls go out a year." Knell responded that he had "an idea" because he had talked to representatives from Sure Tape, the brand name visible on the roll of duct tape recovered from Tucker's home. Tucker's counsel moved to strike Knell's answer based on hearsay, but the motion was overruled. Knell then provided information about Sure Tape's distribution, but conceded that he was not an expert in duct tape distribution or manufacturing.

¶54 On redirect, the State's questions targeted whether the tape was destined for retail or industrial use. Tucker's father worked as a school maintenance worker, and, presumably, the State was trying to link the duct tape found on Ann Marie to the Tucker family. The State elicited that Knell had "reason to believe" that the duct tape found at Tucker's home was not purchased at a retail store. Tucker's counsel objected to foundation. Outside the presence of the jury, Knell said that he had talked with Sure Tape employees and that this "type of research and direct contact with the actual company" was typically performed by other analysts in the field when making comparisons and exclusions and otherwise forming opinions.

¶55 As part of his research, Knell spoke to Karl McFarland, a duct tape expert at Sure Tape's headquarters in

24

North Carolina, and two customer sales representatives at Sure Tape's Phoenix distribution warehouse. Knell's opinion that the duct tape found at Tucker's home was industrial was based on his conversation with McFarland, his own research, and his composition analysis. Knell acknowledged that without speaking to the Sure Tape employees, he would not have been able to reach this conclusion.

¶56 During argument on the objection, Tucker also raised hearsay and confrontation arguments and stated that Knell could not testify about retail or industrial distribution because he lacked personal knowledge. The trial judge recognized that Tucker's counsel had "opened the door on distribution," and overruled Tucker's objection. He permitted Tucker to further cross-examine Knell "on that point to show the flakey nature of the information."

¶57 When redirect resumed with the jury present, Knell testified that McFarland told him that the tape labeled Sure Tape was destined for industrial use, that such tape differed in its composition from Manco tape distributed to retail stores, and that the physical characteristics of the tape found in Tucker's home were consistent with a certain type of industrial Sure Tape. Tucker's counsel declined to further cross-examine Knell and did not request a limiting instruction regarding the basis of Knell's opinion.

## 2. Admissibility of the Statements

### a. Rule 703

**¶58**       We review a trial court's admission of evidence for an abuse of discretion. *Ellison*, 213 Ariz. at 129 ¶ 42, 140 P.3d at 912.   Under Arizona Rule of Evidence 703, "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing."   If the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."   *Id.*   An expert may, therefore, disclose otherwise inadmissible evidence, including the substance of a non-testifying expert's opinion, if such evidence forms the basis of the expert's opinion and is reasonably relied upon by experts in the field.   *See State v. Lundstrom*, 161 Ariz. 141, 145-47, 776 P.2d 1067, 1071-73 (1989). Once disclosed, however, the facts or data relied upon are admissible for the limited purpose of showing the basis of the expert's opinion.   *Id.* at 146, 776 P.2d at 1072.

**¶59**       It is evident that Knell relied, in part, on McFarland's information.   Based on our case law and Knell's testimony that other experts in the field would have researched and directly contacted the company, it was not an abuse of discretion for the judge to conclude that such information is

26

reasonably relied upon by other experts in the field. *See* Joseph M. Livermore et al., *Arizona Practice: Law of Evidence* § 703, at 294 (4th ed. 2000) (stating that Arizona courts "have permitted physicians to rely on the patient's medical history, an appraiser to rely on an official schedule of average reproduction costs of billboards, and a researcher to rely on the social science data he gathered") (footnotes omitted).

¶60    Because an expert witness may testify about the substance of a non-testifying expert's opinion or factual information gleaned from other sources, it was permissible for Knell to reveal the substance of McFarland's statements. *Lundstrom*, 161 Ariz. at 145-47, 776 P.2d at 1071-73. By doing so, McFarland did not reveal hearsay because the information was offered, not for its truth, but for the limited purpose of showing the basis of Knell's opinion. Contrary to Tucker's argument, Knell was not a "mere conduit" for McFarland's statements because McFarland's information, though integral, constituted only part of the information upon which Knell relied in forming his opinion. *See id.* at 148, 776 P.2d at 1074 (discussing improper "mere conduit" testimony).

### b. Confrontation Clause

¶61    We review de novo evidentiary rulings that implicate the Confrontation Clause. *See Ellison*, 213 Ariz. at 129 ¶ 42, 140 P.3d at 912. A defendant has a right to confront hearsay

27

introduced to establish an aggravating circumstance. *McGill*, 213 Ariz. at 159 ¶ 51, 140 P.3d at 942; *State v. Greenway*, 170 Ariz. 155, 161 n.1, 823 P.2d 22, 28 n.1 (1991). Yet, testimony that is not admitted to prove its truth is not hearsay and does not violate the Confrontation Clause. *Crawford*, 541 U.S. at 59 n.9 (stating that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted"); *Roque*, 213 Ariz. at 214 ¶ 70, 141 P.3d at 389 (same).

¶62    Because the facts underlying an expert's opinion are admissible only to show the basis of that opinion and not to prove their truth, an expert does not admit hearsay or violate the Confrontation Clause by revealing the substance of a non-testifying expert's opinion. *State v. Rogovich*, 188 Ariz. 38, 42, 932 P.2d 794, 798 (1997) (stating that defendant has right to confront testifying expert witness, but not individuals "whose findings or research merely form the basis for the witness's testimony"); 4 *Weinstein's Federal Evidence* § 703.06 (Joseph M. McLaughlin ed., 2d ed. 2006) (noting that "courts have generally held that the Confrontation Clause is satisfied if the expert witness is available for cross-examination" and "is not violated by an expert's reliance on out-of-court sources"). Thus, Tucker had a right to confront Knell, the testifying expert, but he did not have a right to confront

28

McFarland, the non-testifying expert, because Knell's statements about his conversation with McFarland were admissible only to show the basis of Knell's opinion.

## II. Penalty Phase Issues

### A. Jury Instructions

¶63    Tucker contends the jury instructions were inconsistent with our opinion in *State ex rel. Thomas v. Granville* (*Baldwin*), 211 Ariz. 468, 473 ¶ 21, 123 P.3d 662, 667 (2005). The instructions, he argues: (1) incorrectly assigned him the burden of proving that the mitigation evidence was sufficiently substantial to call for leniency, and (2) incorrectly adopted a "presumption of death" by directing the jurors to impose a death sentence if no juror found mitigation sufficiently substantial to warrant leniency. Tucker did not object to these instructions below, and we conclude there was no fundamental error.

¶64    A sentencing juror must be allowed to consider and give independent effect to any mitigating evidence that is relevant to the decision to impose the death penalty. *Kansas v. Marsh*, 126 S. Ct. 2516, 2523 (2006). This constitutional requirement of individualized sentencing was met here. At the close of the penalty phase, the jurors were properly instructed that mitigating circumstances were any factors "relevant in determining whether to impose a sentence of less than death" and

29

that they should consider any circumstances presented by Tucker and the State as well as other information admitted as evidence. Finally, the jurors were instructed that, based upon all the evidence presented in the aggravation and penalty phases, they must individually decide whether there was mitigation, the weight to be given to the mitigation, and whether the mitigation was sufficiently substantial to call for leniency.

### 1. The *Baldwin* Error

¶65    The trial court also instructed the jurors that "the defendant has the burden to prove that the mitigation evidence is sufficiently substantial to call for leniency." This instruction, as the State concedes, conflicts with *Baldwin*'s holding that "A.R.S. § 13-703(E) does not impose an affirmative duty on the defendant to prove that mitigation is sufficiently substantial to call for leniency." 211 Ariz. at 472 ¶ 12, 123 P.3d at 666. Tucker contends that this error is structural or, at the very least, fundamental.

¶66    A structural error is one that "affect[s] the entire conduct of the trial from beginning to end, and thus taint[s] the framework within which the trial proceeds." *Henderson*, 210 Ariz. at 565 ¶ 12, 115 P.3d at 605 (quoting *State v. Anderson* (*Anderson I*), 197 Ariz. 314, 323 ¶ 22, 4 P.3d 369, 378 (2000) (internal quotations omitted)). It "deprive[s] defendants of basic protections without which a criminal trial cannot reliably

30

serve its function as a vehicle for guilt or innocence." *Id.* (quoting *Ring III*, 204 Ariz. at 552 ¶ 45, 65 P.3d at 933 (internal quotations omitted)); *see also State v. Glassel*, 211 Ariz. 33, 53 ¶ 74, 116 P.3d 1193, 1213 (2005) (noting in dicta that instruction that improperly reduces state's burden of proof in penalty phase of capital trial is structural error), *cert. denied*, 126 S. Ct. 1576 (2006). We have recognized structural error in only a few instances. *See Ring III*, 204 Ariz. at 552-53 ¶ 46, 65 P.3d at 933-34 (noting structural error when trial judge biased; defendant denied counsel, access to counsel, self-representation, and public trial; reasonable doubt instructions defective; and jurors excluded because of race or views on death penalty).

¶67 In assessing the nature of the *Baldwin* error, we find relevant the recent decision of the Supreme Court in *Marsh*. There, the Supreme Court stated that as long as the "method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged" or aggravating circumstances alleged, the state may place on the defendant "the burden of proving mitigating circumstances sufficiently substantial to call for leniency." 126 S. Ct. at 2523 (quoting *Walton v. Arizona*, 497 U.S. 639, 650 (1990), *overruled on other grounds by Ring v. Arizona* (*Ring II*), 536 U.S. 584, 609 (2002)).

31

¶68    The *Baldwin* error now challenged by Tucker was therefore not of constitutional magnitude, but instead misstated the statutory requirements of A.R.S. § 13-703(E).  We do not find the error structural because it did not reduce the State's burden of proof or preclude the jurors from considering relevant mitigation evidence during the penalty phase.  Instead, the instruction indicated that Tucker had a burden with respect to an issue (the propriety of a death sentence) on which *Baldwin* stated that neither party bears a burden, but that the Supreme Court held could be placed on the defendant.

¶69    We also reject Tucker's argument that the error is fundamental.  Although assigning such a burden to Tucker was inconsistent with A.R.S. § 13-703(E), this case does not qualify as one of the "rare cases" in which the error goes to the foundation of the case or the defendant was denied his right to a fair trial or a right essential to his defense. *See Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

### 2. The Four-Points Instruction

¶70    Tucker argues that the trial court's "four-points" instruction impermissibly created a presumption of death.  The instruction stated:

You can reach a verdict in any of the following ways:

1.   If no jurors find the defendant proved any mitigation by a preponderance of the evidence, you must return a verdict of death.

32

2.    If some jurors find the defendant proved mitigation, the jurors who found mitigation must weigh the mitigation they found against the aggravating factors already found.    The jurors who found mitigation may disagree about what mitigation exists. If all the jurors who found mitigation find the mitigation is not sufficiently substantial to call for leniency and all the remaining jurors continue to find no mitigation exists, you must return a verdict of death.

3.    If all jurors find mitigation exists, all must weigh the mitigation they found against the aggravating factors already found.    The jurors may disagree about what mitigation exists.    If all the jurors find the mitigation is not sufficiently substantial to call for leniency, you must return a verdict of death.

4.    If all jurors find mitigation exists and all find the mitigation they found is sufficiently substantial to call for leniency, you must return a verdict of life imprisonment.

¶71      The first paragraph of the four-points instruction, Tucker contends, is flawed because it told the jurors that they must impose death if no juror found Tucker had proved any mitigation, while *Baldwin* recognized that the jurors may return a verdict of life in prison even if the defendant presents no mitigation evidence.    211 Ariz. at 471 ¶ 12, 123 P.3d at 665. He also argues that the first, second, and third paragraphs of the four-points instruction are incorrect because *Baldwin* allows jurors to vote not to impose death even in the absence of any mitigation.    These arguments misapprehend *Baldwin*.

¶72      Under our statutory scheme, the defendant bears the

burden of *proving* the existence of mitigating circumstances, *see* A.R.S. § 13-703(C), but the jurors are not restricted to only facts *presented* by the defendant in finding mitigation. This point is reflected in *Baldwin*'s statement that a juror could consider mitigating circumstances "proved by the defendant or present in the record." 211 Ariz. at 473 ¶ 18, 123 P.3d at 667. Consistent with *Baldwin*, the jurors were instructed that they should consider "any . . . information admitted as evidence that is relevant in determining whether to impose a sentence less than death so long as it relates to an aspect of the Defendant's character , [sic] propensities, or record and any of the circumstances of the offense." Thus, the jurors were allowed to consider all relevant evidence, and not merely evidence presented by Tucker, in determining if any mitigating circumstances existed.

¶73    The four-points instruction also did not create an impermissible "presumption" of death by instructing the jurors to impose a death sentence if none of them found mitigation sufficiently substantial to warrant leniency. Section 13-703(E) provides that the trier of fact, having found one or more aggravating factors, "shall impose a sentence of death if the trier of fact . . . determines that there are no mitigating circumstances sufficiently substantial to call for leniency." Such a directive does not violate the Eighth Amendment so long

34

as jurors are allowed to consider any mitigating evidence. *See Marsh*, 126 S. Ct. at 2525-26; *Blystone v. Pennsylvania*, 494 U.S. 299, 306-07 (1990).

¶74    *Baldwin* noted that § 13-703(E) allows a juror to vote to impose death only if he or she concludes that there is no mitigation sufficiently substantial to warrant leniency.  211 Ariz. at 473 ¶ 21, 123 P.3d at 667.  This does not imply, however, that a juror may vote for leniency even if he or she finds there is no mitigation or no mitigation sufficiently substantial to warrant a sentence of less than death.  Under our sentencing scheme, a juror must vote against death if he or she individually determines there are any mitigating circumstances sufficiently substantial to warrant leniency; conversely, given the findings of one or more aggravators, a juror must vote to impose a sentence of death if he or she determines there is no mitigation at all or none sufficiently substantial to warrant a sentence of less than death.

¶75    Finally, we reject Tucker's contention that the four-points instruction confusingly directed the jurors to weigh mitigating and aggravating factors.  *Baldwin* discouraged the use of instructions informing jurors that they must find that mitigating circumstances "outweigh" aggravating circumstances before they can impose a sentence other than death.  *Id.*  Such an instruction was not used here, although the four-points

instruction did direct the jury to "weigh" mitigating and aggravating circumstances. The language used here did not constitute fundamental error.

¶76    We reaffirm our statement in *Baldwin* that jury instructions prospectively should avoid "outweighing" language and should clearly explain "that a juror may not vote to impose the death penalty unless he or she finds, in the juror's individual opinion, that 'there are no mitigating circumstances sufficiently substantial to call for leniency.'" *Id.* (quoting A.R.S. § 13-703(E)).

## B. Allocution

¶77    Tucker contends that he could not knowingly, voluntarily, or intelligently waive his right of allocution because it was ambiguously defined by the trial judge. Because Tucker did not object below, we review for fundamental error. *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

¶78    During the penalty phase, the judge informed Tucker that he was uncertain whether or not Tucker could be cross-examined during allocution. Tucker's counsel told Tucker that he could be cross-examined. Tucker declined to allocute.

¶79    In *Anderson II*, we held that even if a defendant is denied the right to allocute at sentencing, "there is no need for resentencing unless the defendant can show that he would have added something to the mitigating evidence already

36

presented." 210 Ariz. at 350 ¶ 100, 111 P.3d at 392 (internal quotations and citations omitted). Tucker concedes that he cannot show what he would have added to the mitigation evidence already presented, even had his right of allocution been more effectively described. Although Tucker's counsel speculates that Tucker could have maintained his innocence or made statements supporting residual doubt, Tucker does not have an Eighth Amendment right to introduce such evidence at the penalty phase. *See Oregon v. Guzek*, 126 S. Ct. 1226, 1232 (2006) (stating that defendant does not have constitutional right to present evidence of residual doubt during sentencing). Thus, Tucker's claim fails under *Anderson II*, regardless of whether he could have been cross-examined during allocution.

## C. Jury Admonition

¶80 Tucker argues that the trial judge did not follow the proper procedural safeguards when he failed to determine on the record whether an alternate juror had followed the admonition before the penalty phase deliberations and to instruct the jury to begin deliberations anew. Tucker did not object at trial and, therefore, we review for fundamental error. *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

¶81 Juror 15 was designated an alternate juror at the close of the aggravation phase. When the jury retired to deliberate during the aggravation phase, the alternate jurors

37

were told that they would not participate, but that they should continue to follow the admonition until they were discharged. Before the penalty phase began, the judge excused a sick juror and instructed the returning alternate jurors to continue to observe the admonition. At the close of the penalty phase, Juror 15 was selected to deliberate.

¶82    The trial judge complied with Arizona Rule of Criminal Procedure 18.5(i) when he instructed Juror 15 to follow the admonition before excusing Juror 15 for the aggravation phase deliberations and renewed the admonition when Juror 15 rejoined the panel for the penalty phase. Indeed, Rule 18.5(i) requires the trial judge to instruct an alternate juror not selected for deliberation in either the aggravation or penalty phase to observe the admonition until discharged. The rule does not, however, prescribe any additional procedure that must be followed when an alternate juror is substituted between the aggravation and penalty phases.

¶83    The trial judge was not required to instruct the jury to begin deliberations anew because such an instruction is required only where a substitution is made after deliberations have begun. Ariz. R. Crim. P. 18.5(i); *see Roseberry*, 210 Ariz. at 372-73 ¶ 71, 111 P.3d at 414-15 (concluding that judge's failure to instruct jury to begin deliberations anew was not error because the juror was substituted before penalty phase

deliberations).

### D. Mitigation Verdict Form

¶84    Tucker argues that the trial judge's failure to provide the jury a mitigation verdict form prevents this Court from conducting a meaningful review.  We rejected this claim in *Roque*, 213 Ariz. at 226 ¶ 141, 141 P.3d at 401.  *See also Roseberry*, 210 Ariz. at 373 n.12 & ¶ 74, 111 P.3d at 415 & n.12.

### E. Prosecutorial Misconduct

¶85    Tucker contends that the prosecutor committed misconduct during the penalty phase closing arguments by stating that Tucker's crimes would "go down in history as some of the worst."  We disagree.

¶86    Before the penalty phase closing arguments, the trial judge instructed the jurors that the lawyers' statements during closing arguments were neither law nor evidence.  During the arguments, the prosecutor discussed Tucker's lack of a criminal record as a mitigating circumstance and stated that "every criminal has a first conviction.  And the severity of this defendant's first conviction, the severity of the crimes for which he has been convicted or found guilty beyond a reasonable doubt of *will go down in history as some of the worst*."  Tucker promptly objected, but the judge overruled the objection and again instructed the jurors that the lawyers' comments during closing arguments were not law or evidence.

39

¶87     The following day, Tucker moved for a mistrial, arguing that the statement improperly interjected the prosecutor's opinion and was irrelevant and prejudicial. The trial judge denied the motion.

¶88     This Court will reverse a conviction based on prosecutorial misconduct when there is misconduct by the prosecutor and "a reasonable likelihood . . . that the misconduct could have affected the jury's verdict, thereby denying [the] defendant a fair trial." *Anderson II*, 210 Ariz. at 340 ¶ 45, 111 P.3d at 382 (internal quotations and citations omitted). Because the trial court is in the best position to determine whether an attorney's remarks require a mistrial, we will not disturb its judgment absent an abuse of discretion. *State v. Robert Jones*, 197 Ariz. 290, 305 ¶ 37, 4 P.3d 345, 360 (2000). The same principles apply to review of a trial court's denial of a mistrial in a capital sentencing proceeding. *See Roque*, 213 Ariz. at 228 ¶ 152, 141 P.3d at 403.

¶89     Read in context, the prosecutor's statement was a comment on the weight the jurors should give the criminal history mitigating circumstance, rather than an improper personal comment on Tucker's criminal history. In any event, the statement was not unduly prejudicial and did not contribute to the jury's verdict because the trial judge advised the jury both before and after the closing arguments that the comments

40

made during the closing were not law or evidence. *See State v. Newell*, 212 Ariz. 389, 403 ¶ 68, 132 P.3d 833, 847 (2006) (stating that the trial judge properly instructed the jury that statements during closing arguments were not evidence), *cert. denied*, 127 S. Ct. 663 (2006). We presume that jurors follow the judge's instructions. *Id.* Moreover, Tucker challenges the propriety of only a single statement, and there was substantial evidence supporting the aggravating circumstances and minimal mitigating evidence. *See infra* ¶¶ 97-119. Thus, the challenged statement does not warrant a reversal of the jury's verdicts.

### F. Victim Impact Statements

¶90 Tucker contends that the admission of victim impact statements violates *Blakely v. Washington*, 542 U.S. 296 (2004), and *Crawford*, 541 U.S. 36, and that one of the statements here was unduly prejudicial.

¶91 During the penalty phase, five victims made statements. Three of the victims read their own statements in court, while third parties read the written statements of two of the victims. Because Tucker did not object to the alleged errors at trial, we review for fundamental error. *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

¶92 Evidence about the victim and the effect of the crime on the victim's family is admissible during the penalty phase as rebuttal to the defendant's mitigation evidence. A.R.S. § 13-

41

703.01(R) (Supp. 2004); *see Roque*, 213 Ariz. at 221 ¶ 114, 141 P.3d at 396; *Ellison*, 213 Ariz. at 140 ¶ 111, 140 P.3d at 923. The evidence may not, however, be so unduly prejudicial that it renders the trial fundamentally unfair. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991).

¶93 In *Roque*, we rejected the claim that the admission of victim impact statements violates *Blakely* because the statements have the "effect" of an aggravating circumstance. 213 Ariz. at 221-22 ¶ 115, 141 P.3d at 396-97.

¶94 Tucker's *Crawford* claim also fails. "[T]he Confrontation Clause does not apply to rebuttal testimony at a sentencing hearing because (1) the penalty phase is not a criminal prosecution, (2) historical practices support the use of out-of-court statements in sentencing, and (3) the sentencing body requires complete information to make its determination." *McGill,* 213 Ariz. at 159 ¶ 52, 140 P.3d at 942; *see id.* at 158 ¶¶ 47, 49, 140 P.3d at 941 (stating that a criminal defendant does not have a right to confront witness at the penalty phase under either the Arizona or Federal Constitution).

¶95 Finally, the victim impact statement challenged as unduly prejudicial stated: "I know that Eugene probably honed in on my sister's insecurities to have his way with her." The statement, which addressed Ann Marie's insecurity, was not unduly prejudicial under *Payne*.

42

## III. Independent Review

¶96      Because Tucker committed his crimes before August 1, 2002, and was later resentenced, this Court must independently review the aggravating and mitigating circumstances and the propriety of the death sentences.  A.R.S. § 13-703.04(A) (Supp. 2004); 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 7(B).

### A. Aggravating Circumstances

¶97      The State identified four aggravating circumstances for each of the three victims.  As noted *supra* ¶¶ 26 and 41, the (F)(3) aggravator for each victim and the (F)(6) aggravator for Roscoe's and Cindy's murders were not proven beyond a reasonable doubt.

### 1. Prior Conviction Subject to a Life Sentence

¶98      To establish the (F)(1) aggravator, the state must prove beyond a reasonable doubt that "[t]he defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable."  A.R.S. § 13-703(F)(1).  As long as the prior conviction is entered before the sentencing hearing, the conviction may support the (F)(1) aggravator even if it is committed before, contemporaneous with, or after the capital homicide.  *State v. Moody*, 208 Ariz. 424, 470 ¶ 215, 94 P.3d 1119, 1165 (2004); *State v. Gretzler*, 135 Ariz. 42, 57 n.2, 659 P.2d 1, 16 n.2 (1983).

43

¶99     Tucker was found guilty of sexual assault pursuant to A.R.S. § 13-1406 (Supp. 1999) and sentenced to twenty-five years to life imprisonment.  We affirmed this conviction and sentence in *Tucker I*.  205 Ariz. at 159 ¶ 1, 170 ¶ 69, 68 P.3d at 112, 123.  Thus, the (F)(1) aggravator was proven beyond a reasonable doubt.

## 2.  Especially Heinous, Cruel, or Depraved

¶100    The "especially cruel" prong of the (F)(6) aggravator focuses on the victim's state of mind.  *Danny Jones*, 185 Ariz. at 487, 917 P.2d at 216.  To establish this prong, the state must prove beyond a reasonable doubt that the defendant knew or should have known that the victim would experience mental anguish or physical pain and that the victim was conscious during some part of the violence.  *Ellison*, 213 Ariz. at 141-42 ¶ 119, 140 P.3d at 924-25; *Trostle*, 191 Ariz. at 18, 951 P.2d at 883.

¶101    Ann Marie was discovered partially clothed and face down with her hands behind her back on her bedroom floor.  She was lying in a pool of blood.  There was evidence of a struggle in the bedroom, as well as blood spatter and cast-off on the walls.  Ann Marie had been bound around the wrists, most likely with handcuffs, and she had been gagged with duct tape.  Ann Marie also had ligature marks consistent with a phone cord around her neck.  The medical examiner opined that the ligature

44

was likely used to control Ann Marie's consciousness.

¶102    Testimony established that Ann Marie suffered trauma caused by a blunt object to the back of the head, resulting in at least four separate and deep lacerations.  She also sustained "painful" bruises and abrasions on the exterior and interior of her vagina and rectum.  Ann Marie was alive when these injuries were inflicted, but the medical examiner could not definitively state whether she was conscious.  Ann Marie was fatally shot at close range in the jaw and behind the left ear.  One of the bullets lacerated her brain stem.  After she was shot, Ann Marie was rolled into the position in which she was discovered.

¶103    In our independent review we find that Ann Marie was conscious when she was bound and strangled.  *See Ellison*, 213 Ariz. at 142 ¶ 121, 140 P.3d at 925 (finding victim conscious when bound in order to prevent struggle).  We also find that Ann Marie's injuries indicate that she suffered extreme physical pain when she was bludgeoned, sexually assaulted, and strangled. Accordingly, the State established beyond a reasonable doubt that Ann Marie's murder was "especially cruel," and we need not also determine whether her murder is "especially heinous or depraved."  *McGill*, 213 Ariz. at 155 n.1 ¶ 32, 140 P.3d at 938 n.1 (recognizing that the (F)(6) aggravator is disjunctive).

### 3.  Multiple Murders

¶104    To establish the (F)(8) multiple murders aggravator,

45

the state must prove beyond a reasonable doubt that "[t]he defendant has been convicted of one or more other homicides, as defined in [A.R.S.] § 13-1101 [Supp. 1999], which were committed during the commission of the offense." A.R.S. § 13-703(F)(8) (Supp. 1999). "[T]he homicides must be temporally, spatially, and motivationally related, taking place during 'one continuous course of criminal conduct.'" *State v. Prasertphong*, 206 Ariz. 167, 170 ¶ 15, 76 P.3d 438, 441 (2003) (quoting *Rogovich*, 188 Ariz. at 45, 932 P.2d at 801); *see also Anderson II*, 210 Ariz. at 351-52 ¶ 108, 111 P.3d at 393-94 (finding spatial requirement satisfied when three victims killed on same property); *State v. Dann*, 206 Ariz. 371, 373 ¶ 9, 79 P.3d 58, 60 (2003) (finding temporal requirement satisfied when there was a "short, uninterrupted span of time in which" victims were killed and motivational requirement satisfied when defendant went to a residence to kill one victim and killed two additional victims merely because they were present or witnesses). If proven, the (F)(8) aggravator applies to each of the homicides. *State v. Djerf*, 191 Ariz. 583, 597 ¶ 57, 959 P.2d 1274, 1288 (1998).

¶105 The record demonstrates that all three murders occurred on the same day and in the same apartment. And, as we recognized in *Tucker I*, "it is difficult to imagine a motive for the killings [of Roscoe and Cindy] unrelated to the murder of AnnMarie [sic]." 205 Ariz. at 169 ¶ 66, 68 P.3d at 122.

46

Accordingly, the State proved the (F)(8) aggravator beyond a reasonable doubt.

## B. Mitigating Circumstances

**¶106** The defendant has the burden to prove mitigating circumstances by a preponderance of the evidence. A.R.S. § 13-703(C); *Baldwin*, 211 Ariz. at 472 ¶ 14, 123 P.3d at 666. Any relevant mitigation evidence that supports a sentence less than death is admissible. *Ellison*, 213 Ariz. at 144 ¶ 132, 140 P.3d at 927. While there need not be a causal nexus between the mitigation evidence and the crime, *id.*, such a relationship may impact "the quality and strength of the mitigation evidence," *Newell*, 212 Ariz. at 405 ¶ 82, 132 P.3d at 849.

**¶107** Tucker proffered five mitigating circumstances: (1) age; (2) no prior criminal record; (3) good behavior while in prison; (4) good family and interpersonal relationships; and (5) a narcissistic personality disorder.

**¶108** The defendant's age is a statutory mitigating circumstance, A.R.S. § 13-703(G)(5), which may be "substantial and relevant," *Poyson*, 198 Ariz. at 80 ¶ 37, 7 P.3d at 89. In considering the defendant's chronological age, we also examine the defendant's "level of intelligence, maturity, past experience, and level of participation in the killings." *Id.*

**¶109** Tucker's father, Tucker Sr., testified that Tucker was born on July 5, 1981. Tucker therefore turned eighteen years

47

old just ten days before the murders, yet Tucker's counsel did not stress this fact.

¶110    Tucker Sr. insisted that his son did not have a learning disability, but Dr. Thomas Gaughn, a defense psychiatrist, stated that Tucker had a learning disability and received special education services in school.  There was no significant testimony about Tucker's level of maturity, other than the fact that he lived at home, took law enforcement courses, and desired to join the military after school. Although there was minimal additional evidence, Tucker's chronological age is sufficient to establish this mitigating circumstance by a preponderance of the evidence.

¶111    With respect to the second proffered circumstance, this Court has found that a defendant's lack of a prior criminal record may be a mitigating circumstance.  *See State v. Davolt*, 207 Ariz. 191, 216 ¶ 113, 84 P.3d 456, 481 (2004); *Prasertphong*, 206 Ariz. at 171 ¶ 20, 76 P.3d at 442.  Tucker established that he had no prior criminal record by a preponderance of the evidence.

¶112    For the third mitigating circumstance, Tucker's good behavior while in prison, Tucker Sr. testified that his son was adapting and behaving well in prison.  Dr. Gaughn confirmed that Tucker had "an absence of problems" while in prison.

¶113    Because all prisoners are expected to behave and adapt

48

to prison life, we typically do not give much weight to a defendant's good behavior while in prison. *E.g.*, *State v. Harrod*, 200 Ariz. 309, 319 ¶ 53, 26 P.3d 492, 502 (2001) (stating that trial court need not give this circumstance much weight because all prisoners are expected to behave), *rev'd on other grounds*, 536 U.S. 953 (2002); *State v. White*, 194 Ariz. 344, 355 ¶ 47, 982 P.2d 819, 830 (1999) (recognizing that defendant's good behavior in prison may be mitigating). We therefore afford this mitigating circumstance minimal weight.

¶114 On the fourth mitigating circumstance, Tucker's good relationships with family and friends, Tucker Sr. testified that his son had friends in grade and middle school and was a "normal" child. He said that his son had to change high schools after being "jumped" by a gang, but insisted that Tucker's grades improved and he made friends after changing schools. Tucker Sr. further stated that Tucker had "excellent" interactions with his family and Tucker's sisters had visited him in prison.

¶115 The State countered by introducing evidence that Tucker got into fights during elementary school and once injured another student with a pencil sharpener or eraser. Additionally, Tucker Sr. acknowledged that he "had very little contact with" his son in the years preceding his arrest and had to place dead bolt locks on the interior doors of the family's

49

home after his children accused each other of stealing.

¶**116** A defendant's relationship with his or her family and friends may be a mitigating circumstance, yet the Court has often found that this circumstance should be given little weight. *E.g.*, *State v. Cañez*, 202 Ariz. 133, 164 ¶ 120, 42 P.3d 564, 595 (2002); *State v. Carriger*, 143 Ariz. 142, 162, 692 P.2d 991, 1011 (1984). Thus, in light of the conflicting testimony, we afford this circumstance minimal significance.

¶**117** With respect to the final mitigating circumstance, Dr. Gaughn testified that Tucker suffers from a narcissistic personality disorder. According to Dr. Gaughn, individuals with this disorder tend to inflate their abilities, become easily emotional, and have difficulty interacting with others and adapting to their surroundings. They may also have "unrealistic belief[s]" about their own accomplishments and "unreasonable expectation[s]" of favorable treatment. Dr. Gaughn did not believe that Tucker had an anti-social personality disorder and opined that a narcissistic personality disorder may be treatable in certain cases. On cross-examination, he speculated that Tucker could have had an intensely negative emotional reaction to Ann Marie's rejection, consistent with a narcissistic personality disorder.

¶**118** Under A.R.S. § 13-703(G)(1), it is a statutory mitigating circumstance if "[t]he defendant's capacity to

50

appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." Personality or character disorders, however, typically do not satisfy this mitigator, *State v. Kayer*, 194 Ariz. 423, 437 ¶ 49, 984 P.2d 31, 45 (1999), and the absence of a causal connection between the disorder and the crime diminishes the weight that this Court affords such disorders, *see Roque*, 213 Ariz. at 231 ¶ 169, 141 P.3d at 406 (recognizing that defendant need not establish causal connection between mental capacity and crime, but court may consider such connection in evaluating mitigation evidence). Although there was testimony that Tucker may have had an intensely negative emotional reaction to Ann Marie's rejection consistent with a narcissistic personality disorder, such testimony did not establish a causal connection. Moreover, Dr. Gaughn did not state that Tucker's disorder impaired his ability to appreciate the wrongfulness of his conduct or to conform it to the law at the time of the murders. Thus, Tucker's disorder does not rise to the level of a statutory mitigating circumstance, and we give it little weight as a non-statutory mitigating circumstance.

¶119 In sum, the most compelling mitigating circumstances were Tucker's age and lack of a prior criminal record.

51

## C. Propriety of the Death Sentences

¶**120**      Although we have set aside the (F)(3) aggravator for all three murders and the (F)(6) aggravator for Roscoe's and Cindy's murders, we will independently review the propriety of Tucker's death sentences to determine whether the mitigation is sufficiently substantial to call for leniency.  *See* A.R.S. § 13-703.04(B).  In doing so, we will "consider the quality and the strength, not simply the number, of aggravating and mitigating factors."  *State v. Greene*, 192 Ariz. 431, 443 ¶ 60, 967 P.2d 106, 118 (1998).  We conclude that Tucker's mitigation evidence is not sufficiently substantial to warrant leniency in light of the three aggravators that remain for Ann Marie's murder and the two aggravators that remain for Roscoe's and Cindy's murders.  Thus, we uphold Tucker's three death sentences.

## IV. Arguments Preserved for Federal Review

¶**121**      Tucker raises eleven other constitutional challenges to preserve for federal review.  These arguments are set forth in the Appendix.

## V. Conclusion

¶**122**      For the reasons stated above, we affirm each of Tucker's three death sentences.

_____
W. Scott Bales, Justice

52

CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Rebecca White Berch, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
Jon W. Thompson, Judge[2]

---

[2] Pursuant to Article 6, Section 3, of the Arizona Constitution, the Honorable Jon W. Thompson, Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.

**APPENDIX**

Tucker raises the following claims to preserve them for federal review:

(1)    The death penalty is an irreversible denial of human rights and violates the Eighth Amendment and international law. The Court found it unnecessary to consider whether the death penalty violates international law in *State v. Richmond*, 136 Ariz. 312, 322, 666 P.2d 57, 67 (1983), and rejected the argument that the death penalty violates the Eighth Amendment in *State v. Towery*, 186 Ariz. 168, 190, 920 P.2d 290, 312 (1996).

(2)    The indictment violated the Fifth, Sixth, Eighth, and Fourteenth Amendments because it failed to allege the aggravating factors. The Court rejected this argument in *McKaney v. Foreman ex rel. County of Maricopa*, 209 Ariz. 268, 271 ¶¶ 13, 15, 100 P.3d 18, 21 (2004).

(3)    Tucker's sentences constitute an impermissible violation of the Ex Post Facto application of the law offending the Eighth and Fourteenth Amendments. This Court rejected this argument in *Ellison*, 213 Ariz. at 146 app. A, 140 P.3d at 929.

(4)    Arizona's death penalty statute is unconstitutional under all circumstances because it is cruel and unusual. This Court and the United States Supreme Court have rejected this argument. *Gregg v. Georgia*, 428 U.S. 153, 186-87 (1976); *State v. Salazar*, 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992).

(5)    The death penalty is arbitrarily and irrationally imposed in Arizona in violation of the Eighth and Fourteenth Amendments and Article 2, Sections 1, 4, and 15, of the Arizona Constitution. The Court rejected this argument in *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

(6)    The prosecutor's discretion to seek the death penalty has no standards and thereby violates the Eighth and Fourteenth Amendments and Article 2, Sections 1, 4, and 15, of the Arizona Constitution. The Court rejected this argument in *Cromwell*, 211 Ariz. at 192 ¶ 58, 119 P.3d at 459.

(7)     The death penalty discriminates against the poor, young, and male.  The Court rejected this argument in *State v. Stokley*, 182 Ariz. 505, 516, 898 P.2d 454, 465 (1995).

(8)     The absence of proportionality review denies capital defendants rights guaranteed by the Fifth, Eighth, and Fourteenth Amendments and Article 2, Section 15, of the Arizona Constitution.  The Court has rejected this argument. *State v. Gulbrandson*, 184 Ariz. 46, 73, 906 P.2d 579, 606 (1995) (citing *Salazar*, 173 Ariz. at 416, 844 P.2d at 583).

(9)     A.R.S. § 13-703.01 is unconstitutional because it does not require that aggravators are found beyond a reasonable doubt to outweigh the mitigators.  The Court has rejected this argument.  *White*, 194 Ariz. at 355-56 ¶ 49, 982 P.2d at 830-31.

(10)    Execution by lethal injection is cruel and unusual punishment.  The Court rejected this claim in *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

(11)    The failure to instruct on residual doubt violates due process.  The United States Supreme Court rejected this claim in *Guzek*, 126 S. Ct. at 1232.