SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-06-0295-AP |
| Appellee, | ) | |
| | ) | Yavapai County |
| v. | ) | Superior Court |
| | ) | No. CR950448 |
| PHILLIP ALAN BOCHARSKI, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |
| | ) | |
| | ) | **O P I N I O N** |
| _____ | ) | |

Appeal from the Superior Court in Yavapai County
The Honorable William T. Kiger, Judge

**SENTENCE REDUCED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
     By    Kent E. Cattani, Chief Counsel, Capital
           Litigation Section
           Deborah A. Bigbee, Assistant Attorney General
Attorneys for State of Arizona

DAVID GOLDBERG, ATTORNEY AT LAW                           Flagstaff
     By    David Goldberg
Attorney for Phillip Alan Bocharski
_____

**M c G R E G O R**, Chief Justice

¶1      A jury found Phillip Alan Bocharski guilty of first-degree felony murder and burglary in the first degree. A judge subsequently sentenced Bocharski to death. On appeal, this Court affirmed Bocharski's convictions, *State v. Bocharski* (*Bocharski I*), 200 Ariz. 50, 63 ¶ 68, 22 P.3d 43, 56 (2001), but

reversed the death sentence, concluding that Bocharski received inadequate funding for a mitigation investigation, *id.* at 62 ¶ 62, 22 P.3d at 55. We remanded the case for resentencing. *Id.* at 63 ¶ 68, 22 P.3d at 56.

¶2        On remand, a new jury found that the State had established two aggravating factors beyond a reasonable doubt: the murder was committed in an especially heinous or depraved manner, Arizona Revised Statutes (A.R.S.) section 13-703.F.6 (Supp. 2007),[1] and the defendant was an adult at the time of the offense and the victim was over the age of seventy years, A.R.S. § 13-703.F.9. The jury determined that the mitigation was not sufficiently substantial to warrant leniency and that the death penalty was appropriate.

¶3        Pursuant to Arizona Rule of Criminal Procedure 31.2(b), Bocharski's appeal to this Court is automatic. We exercise jurisdiction pursuant to Article 6, Section 5.3, of the Arizona Constitution. For the reasons described below, we reduce Bocharski's sentence from death to natural life.

**I.**[2]

_____

[1]    We cite the current version of the applicable statute because no revisions material to this decision have since occurred.

[2]    We view the facts in the light most favorable to upholding the jury's verdict. *State v. Tucker*, 205 Ariz. 157, 160 n.1, 68 P.3d 110, 113 n.1 (2003).

2

¶4        In November 1994, Bocharski left Michigan, where his family lived, and traveled to Arizona with an acquaintance named Frank Sukis.[3]  Initially, Bocharski and Sukis lived together, but after several months Bocharski moved to Congress, where he lived alone in a tent.  In April 1995, Freeda Brown parked her travel trailer about fifty yards from Bocharski's camp.  Soon after Brown arrived, she met Bocharski and paid him several times to do odd jobs and to drive her to perform errands.

¶5        On May 10, 1995, Bocharski and Sukis went to Richard Towell's campsite.  At the resentencing hearing, Bocharski testified that he was drunk when he left the camp at around four or five o'clock in the afternoon.  On the way back home from Towell's camp, Sukis and Bocharski stopped at the Arrowhead Bar where, Bocharski testified, he "had a couple of bourbon and cokes and a beer or two."  By the time Bocharski left the bar, he testified, he was "three sheets into the wind."

¶6        Sukis dropped Bocharski off down the road from his campsite.  On the way back to his site, Bocharski noticed that the lights in Brown's trailer were on and that her dog was tangled up in the bushes outside the trailer.  Bocharski continued to consume whiskey and beer at his camp.  After

---

[3]    Bocharski's relationship with his wife and three children had deteriorated due to his worsening alcohol abuse.  Bocharski and his wife separated in the spring of 1988 after approximately five years of marriage.

fifteen or twenty minutes, Bocharski decided to go to Brown's trailer to let her know her dog was tangled up in the bushes. Around nine-thirty at night, he knocked on Brown's door and, as she always did, she stepped back to let him inside.

¶7     Once inside, they discussed whether Brown wanted him to unhook her dog from the bushes. Bocharski said that he was concerned with the way Brown treated her animals; he had observed her dog tangled and unable to reach its food and water on several occasions. On one occasion, he saw kittens in jars filled with water and speculated that Brown may have drowned them. Bocharski testified that he does not remember what Brown said during their argument, but that he just "snapped" and stabbed Brown twice in the head, after which she "sat back on her bed and leaned over to the side." He stated that he then lifted her feet onto the bed and covered her with a blanket. He further testified that he panicked and wanted to make the killing appear as part of a robbery, so he stole money from Brown's purse. Bocharski locked the door of the trailer and returned to his campsite.

¶8     Several times during the days following the murder, Dwayne Stalley drove by Brown's trailer and, on the third occasion, noticed that her dog's rope was wound around the tree. After no one answered the door of Brown's trailer, he unwound the dog. Upon finding the dog wound up again the next morning,

4

he became concerned. On May 13, 1995, Stalley and Sukis went to investigate Brown's whereabouts. Sukis popped open the door of Brown's trailer and found her deceased in her bed. Stalley then called the sheriff.

¶9     Raymond Belmore, a patrol deputy for Yavapai County, responded to the call. Belmore entered Brown's trailer and saw no signs of foul play. Belmore removed the blanket covering Brown and, he testified, found the body decomposed and noticed wounds to her face that he thought had been caused by her kittens "eating at the flesh."

¶10    Because Deputy Belmore concluded that Brown had died of natural causes, he turned her trailer and property over to her friends pursuant to her will. On May 14, 1995, however, the medical examiner determined that Brown's death was not likely to have been from natural causes.

¶11    On May 15, 1995, Dr. Joseph Dressler, a forensic pathologist, performed an autopsy. He found at least twenty-four overlapping knife injuries; eight injuries resulted from deeper penetrating stab wounds. With the exception of one small wound on Brown's right index finger, the wounds were confined to the left side of Brown's head and face. The doctor said one of the wounds was fatal and would have rendered Brown unconscious within seconds. The doctor testified that more than likely all the wounds were inflicted in less than one minute. Although

5

Bocharski testified to stabbing Brown only twice, when faced with the evidence that Brown had actually been stabbed many more times, he said he did not remember causing the rest, but did not dispute the evidence.

## II.

## A.

¶12    Bocharski's first argument on appeal is that he did not receive proper pretrial notice of the aggravating circumstances alleged by the State. We review a failure to provide timely notice of aggravating circumstances for prejudice. *State v. Cropper*, 205 Ariz. 181, 184 ¶ 15, 68 P.3d 407, 410 (2003).

¶13    On June 1, 1995, the State charged Bocharski by information. On June 27, 1995, the State filed a notice and disclosure of its intent to seek the death penalty. Although the State asserted it need not disclose specific aggravating factors until after conviction, *see* Arizona Rule of Criminal Procedure 15.1(g)(2) (1996),[4] the State also asserted it had "provided complete discovery in this case which shows evidence of at least three aggravating conditions: victim's age; cruel and heinous; for pecuniary gain." After a hearing on April 18,

---

[4]    Current Rule 15.1(i)(2) (2008) requires the state to provide notice of aggravating circumstances within sixty days of arraignment, but applies only to cases in which the charging document was filed on or after December 1, 2003.

1996, the trial court concluded that the State had disclosed the factors it believed could be aggravating circumstances.

¶14     On September 19, 1996, six days after Bocharski was convicted of first-degree felony murder and approximately seven months before the original aggravation hearing, the State submitted its Rule 15.1(g)(2) notice formally alleging the three aggravating circumstances earlier listed: A.R.S. § 13-703.F.5 (pecuniary gain); A.R.S. § 13-703.F.6 (heinous, cruel or depraved); and A.R.S. § 13-703.F.9 (victim's age).  On October 17, 2001, we remanded this case to the superior court for resentencing.  Three years before resentencing, in June 2003, the State filed its notice asserting the same three aggravating circumstances.

¶15     Bocharski argues he failed to receive proper notice of the aggravating circumstances because he was not provided notice until after he was convicted.[5]  We rejected this precise argument in *State v. Hampton*, 213 Ariz. 167, 174-75 ¶¶ 27-28, 140 P.3d 950, 957-58 (2006).  *See also State v. Ellison*, 213 Ariz. 116, 135-36 ¶¶ 77-80, 140 P.3d 899, 918-19 (2006).

¶16     Moreover, Bocharski was not prejudiced by the timing

---

[5]     Bocharski does not dispute that the State complied with then-existing notice requirements under Arizona Rule of Criminal Procedure 15.1(g)(2) (requiring notice of aggravators no later than ten days after a guilty verdict).  The current death penalty statute requiring pre-trial notice of aggravators did not take

7

of the notice he received of the aggravating circumstances. Bocharski received notice of the aggravators the State intended to prove months before the commencement of the guilt proceeding, received the State's formal notice of aggravators seven months before the original sentencing phase, and received notice of the same three aggravators three years before resentencing. *See Hampton*, 213 Ariz. at 175 ¶ 28, 140 P.3d at 958 (finding no prejudice when defendant received notice of the aggravating circumstances eight months before the sentencing phase).

**B.**

¶17 Bocharski next maintains that using a death-qualified jury violated his constitutional rights. We review constitutional issues de novo. *State v. Pandeli* (*Pandeli III*), 215 Ariz. 514, 522 ¶ 11, 161 P.3d 557, 565 (2007).

¶18 This Court has consistently upheld death qualification of jurors against constitutional challenge. *See, e.g.*, *State v. Moody*, 208 Ariz. 424, 449 ¶¶ 83-84, 94 P.3d 1119, 1144 (2004); *State v. Hoskins*, 199 Ariz. 127, 141-42 ¶¶ 49-50, 14 P.3d 997, 1011-12 (2000).

¶19 Bocharski further claims that an improper shifting of responsibility occurred between the original trial jury and the resentencing jury with respect to the ultimate decision to

---

effect until August 2002, after Bocharski's original trial. *See* A.R.S. § 13-703.01.B (Supp. 2007).

8

sentence him to death.  *See Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985) (finding that a jury should not be "led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere").  He asserts that the first jury abdicated its responsibility for imposing the death penalty to the second jury, and the second jury was relieved of the gravity of its decision because the jurors could rationalize that the first jury was responsible.

¶20     We have previously rejected similar arguments.  *See Hampton*, 213 Ariz. at 175 ¶ 31, 140 P.3d at 958 (rejecting the defendant's argument because the instruction made it clear that the penalty phase jury was responsible for the sentencing decision); *Ellison*, 213 Ariz. at 136 ¶ 83, 140 P.3d at 919.  The trial judge was correct in not instructing the original trial jury that it was responsible for determining Bocharski's sentence: At the time of the original trial, jurors played no role in finding aggravating factors or in sentencing a defendant.  Moreover, the resentencing jury received clear instruction that it alone determined the appropriate sentence for Bocharski.

## C.

¶21     Following remand, Bocharski moved to re-impanel the original jury, arguing that if a new jury were impaneled, nearly the entire case would have to be retried so that the new jury

9

would have the same knowledge as the prior trial jury. The trial judge denied the motion to impanel the original jury. Before resentencing, in an apparent change of position, Bocharski urged the court to limit the State's presentation of evidence related to guilt. Subsequently, the judge ruled, with respect to the aggravation phase, that "the only testimony, exhibits and evidence that are going to be admitted will be those that are directly relevant to one of the three aggravating circumstances that have been alleged."

¶22     Bocharski now contends that his constitutional rights were violated because he was sentenced before a jury that did not hear all the evidence that was admitted at the guilt proceeding.   We rejected a similar argument in *State v. Anderson*, 210 Ariz. 327, 347-48 ¶¶ 81-86, 111 P.3d 369, 389-90 (2005).   Moreover, after the judge denied the motion to impanel the original jury, Bocharski requested that only evidence relevant to the aggravating factors be admitted in the aggravation phase, and the judge granted that request.

¶23     Similarly, Bocharski asserts that A.R.S. § 13-703.01.E, which requires jurors to determine whether any aggravating fact "has been proven based on the evidence that was presented at the trial or at the aggravation phase," was violated because the resentencing jury did not hear evidence from the guilt proceeding that was relevant to aggravation,

10

mitigation, and whether to impose the death penalty. We rejected this argument in *Hampton*, 213 Ariz. at 175 ¶¶ 29-30, 140 P.3d at 958.

¶24    Bocharski argues that prior case law resolving this issue relied upon the premise that "nothing prevented [the defendant] from introducing evidence from the guilt proceeding at his sentencing proceeding," *Ellison*, 213 Ariz. at 136 ¶ 82, 140 P.3d at 919, which is not the case here. Bocharski asserts that many of the witnesses from the original guilt proceeding were dead or otherwise unavailable when evidence was presented to the resentencing jury.

¶25    With the exception of the cross-examination testimony of Frank Sukis, who died before resentencing, Bocharski did not seek to introduce evidence from the original trial.[6] Some of the specific testimony to which Bocharski refers in his brief could have been elicited by calling witnesses to testify during resentencing. Bocharski also could have sought to introduce testimony from unavailable witnesses by transcript, as the State did with Sukis's testimony. Further, through the testimony of Mary Durand, a mitigation specialist, evidence from unavailable

---

[6]    Bocharski maintains that during the first trial, Sukis was not permitted to answer questions regarding Bocharski's drinking habits around the time of the murder. Testimony from other witnesses during the penalty phase, however, established that he was drinking heavily before the murder.

11

witnesses was admitted in the penalty phase. We find Bocharski's attempt to distinguish the prior case law unpersuasive.

**D.**

¶26    Next, Bocharski maintains that the court failed to comply with *Morgan v. Illinois*, 504 U.S. 719 (1992). We review errors concerning the life and death qualification of the jury for an abuse of discretion. *See State v. Jones*, 197 Ariz. 290, 303 ¶ 26, 4 P.3d 345, 358 (2000).

¶27    The trial judge denied Bocharski's request to death-qualify the jurors with a questionnaire and informed counsel he would use the voir dire method employed in *State v. Roseberry*, 210 Ariz. 360, 366 ¶ 28, 111 P.3d 402, 408 (2005), in which jurors who had reservations about the death penalty were taken into chambers for individual questioning. The trial judge permitted each party to question jurors regarding the death penalty and allowed each to conduct individual questioning even if the potential juror did not express reservations about the death penalty. The sentencing jury was selected from two different panels; Bocharski makes no argument as to the questioning of the first panel.

¶28    The second panel of prospective jurors received general information about the crime of which Bocharski had been convicted and the duty of the jury in the resentencing trial.

12

[7] The judge asked for a show of hands of anyone who would respond affirmatively to the *Witherspoon* question and recorded their names. The court then asked the panel if there is "anyone who believes that all persons convicted of first degree murder should receive the death penalty?" (*Morgan* question.) The judge then stated, "I need the names of those people then." Juror 2 raised his hand and was rehabilitated upon further questioning. The judge then stated:

> Now that I clarified that again, are there any other hands of people who would agree if you are found guilty of first degree murder, then the only conclusion should be the death penalty?
> Do you understand what – what I am asking is, this would not be an appropriate trial for you, and the reason is a trial juror in this situation is to consider all the testimony and evidence before making that decision and has to consider the law as given to them in this situation and then make a decision as to what is the appropriate sentence.
> Again, either way, anybody that I haven't got on the list yet who believes there is a question as far as the death penalty is concerned one way or the other?

---

[7] *Witherspoon v. Illinois*, 391 U.S. 510 (1968).

13

No one raised a hand to have his or her name placed on the list after the judge made this statement. The court and counsel then individually questioned jurors whose names had been placed on the list.

¶29 The following morning, defense counsel alleged that four jurors had raised their hands after the judge initially posed the *Morgan* question to the second panel. Counsel claimed that although Juror 2 was questioned and rehabilitated, nothing ever happened with respect to the other jurors who raised their hands. Counsel requested the question be repeated, and the judge agreed to refresh the remaining jurors "about both angles of it."

¶30 During the morning session, the judge explained the capital sentencing process to the combined panel and then addressed issues related to the death penalty, reiterating the substance of the *Witherspoon* and *Morgan* questions and asking if any jurors, after having an evening to think it over, would like to have their names put on the list to have an individual discussion with the judge. Jurors 90 and 92, who were originally members of the second panel, raised their hands in response to this question.

¶31 Thirty-five persons from the combined panel were then randomly selected to sit in the jury box. During voir dire,

14

defense counsel asked all thirty-five jurors the *Morgan* question. No one raised a hand in response to this question.

¶32 At Bocharski's request, the trial judge repeated the substance of both the *Witherspoon* and *Morgan* questions, excused Jurors 90 and 92 after further questioning revealed that they were automatically in favor of death upon conviction for first-degree felony murder, and permitted counsel to conduct voir dire about the death penalty. We find no failure to comply with the dictates of *Morgan v. Illinois*.

### E.

¶33 Bocharski next claims he was deprived of his right to cross-examination, confrontation, a fair sentencing trial, and due process because the court admitted excised portions of Sukis's testimony from the original trial. We review evidentiary rulings that implicate the Confrontation Clause de novo. *State v. Tucker*, 215 Ariz. 298, 315 ¶ 61, 160 P.3d 177, 194 (2007).

¶34 Sukis testified in the original trial and was subject to cross-examination. Because Sukis was not available as a witness at resentencing, Bocharski moved to preclude the State from reading into the record or making any reference to Sukis's prior testimony.

¶35 The trial judge ruled that Sukis's testimony was admissible insofar as it related to specific aggravators alleged

15

by the State. The judge reasoned that Bocharski had an opportunity to cross-examine Sukis under oath at the original trial when the aggravators alleged at resentencing "were on the table."

¶36     Most of the testimony provided by Sukis related to the pecuniary gain aggravating factor, which the resentencing jury did not find. The resentencing jury did hear a few of his statements related to the heinous or depraved aggravator (F.6) and the age of victim aggravator (F.9). Specifically, Sukis testified about the age of the victim, stating, "She's 84 – 85 years old." Sukis also described the victim when he found her in her trailer: (1) "She was laying on the side, more in fetal position, right side. Arms between her knees; somewhat of a fetal position," and (2) "I seen all the wounds on her head and face," which were on "[t]he left side."

¶37     Bocharski contends that admitting Sukis's testimony violated the hearsay rule and the Confrontation Clause. In criminal proceedings, former testimony is not excluded by the hearsay rule if the declarant is unavailable as a witness and "[t]he party against whom the former testimony is offered was a party to the action or proceeding during which a statement was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which the party now has." Ariz. R. Crim. P. 19.3(c); *see also* Ariz. R.

16

Evid. 804(b)(1).  Admission of testimonial hearsay violates the Confrontation Clause of the Sixth Amendment unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination.  *See Crawford v. Washington*, 541 U.S. 36, 68 (2004).

¶38      Confrontation Clause and hearsay rule violations are subject to harmless error analysis.  *See State v. Bass*, 198 Ariz. 571, 580-81 ¶ 39, 12 P.3d 796, 805-06 (2000) (considering whether admission of evidence that violated the hearsay rule and the Confrontation Clause was harmless).  "[E]rroneously admitted evidence is harmless in a criminal case only when the reviewing court is satisfied beyond a reasonable doubt that the error did not impact the verdict."  *Id.* at 580 ¶ 39, 12 P.3d at 805.

¶39      Even if we assume arguendo that the trial judge erred in admitting Sukis's testimony, which had been redacted to include only testimony that related to the alleged aggravators, Bocharski cannot show the error impacted the verdict.  The majority of the testimony read to the jury related to the pecuniary gain aggravator, which the jury did not find.[8]

¶40      Sukis's testimony related to the two aggravators that the jury did find was superfluous, as other proof supported

---

[8]    For example, Sukis testified that Bocharski came into money the day after the murder and then told Sukis the money was an advance to do a "hit job."

those aggravators. *See id*. at 581 ¶ 40, 12 P.3d at 806 ("A proposition sought to be proven by tainted evidence is 'otherwise established' only where we are convinced beyond a reasonable doubt that the tainted evidence was superfluous and could not have affected the verdict.").

¶41 Sukis's testimony about the victim's age was superfluous; Brown's daughter testified to her mother's age and copies of the victim's birth and death certificates were admitted into evidence. The limited testimony from Sukis related to the heinous or depraved aggravator also was superfluous. The first officer on the scene testified that Brown was found lying on her right side with her legs slightly drawn up as though in a fetal position. Also, Dr. Dressler detailed the number, location, and type of wounds Brown suffered. Therefore, admission of Sukis's testimony related to the two aggravators found by the jury was, at most, harmless error.[9]

**F.**

---

[9] Bocharski also asserts that admitting Sukis's testimony violated his due process and Eighth Amendment rights. These arguments were stated but not supported in the briefs submitted to this Court. Arizona Rule of Criminal Procedure 31.13(c)(vi) requires that arguments contain "the reasons therefor, with citations to the authorities, statutes and parts of the record relied on." We therefore do not consider these assertions.

¶42      Bocharski maintains that the court committed fundamental error by failing to give a lost or unpreserved evidence instruction pursuant to *State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964). We review a trial court's decision to grant or deny a requested *Willits* instruction for an abuse of discretion. *State v. Murray*, 184 Ariz. 9, 33, 906 P.2d 542, 566 (1995).

¶43      A forensic pathologist conducted an autopsy of the victim's body on the evening of May 15th, nearly five days after death. The defense did not conduct an independent autopsy.[10]

¶44      During the original trial, Bocharski asserted that the State should have preserved the evidence, and the judge gave the jury a *Willits* instruction. The defense did not request that a *Willits* instruction be given during the resentencing trial, and none was given. Bocharski now claims that he was prejudiced by not being able to conduct an independent autopsy to establish that some of the wounds were caused by the victim's cats eating her flesh. We review for fundamental error. *State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005) ("Fundamental error review . . . applies when a defendant fails to object to alleged trial error."). Fundamental error is

---

[10]   Bocharski contends that the body was not preserved or made available for an independent autopsy even though he was already in custody. Bocharski, however, does not cite to any portion of the record that supports this statement.

limited to "error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial." *Id.* (quoting *State v. Hunter,* 142 Ariz. 88, 90, 688 P.2d 980, 982 (1984)). To prevail on such a claim, the defendant bears the burden of proving that fundamental error exists and that the error caused him or her prejudice. *Id.* ¶ 20.

¶45 We find no error, let alone fundamental error. The resentencing record does not support the theory that Brown's cats inflicted any of the wounds. The jury heard uncontroverted testimony that the wounds were caused by a "knife-like weapon." Further, when asked about the interval of time between the various wounds, the medical examiner stated: "There could have been seconds, maybe minutes. A lot of these wounds were associated – especially the ones to the cheek – there was blood in the tissues, which indicated that [Brown] had a blood pressure when these wounds were inflicted." This limited time frame further contradicts any theory the cats caused some of the wounds.

¶46 Moreover, the defense did not rely at resentencing on the theory that Brown's cats inflicted the wounds. *See State v. Smith*, 158 Ariz. 222, 227, 762 P.2d 509, 514 (1988) ("A *Willits* instruction must be predicated on a theory supported by the

20

evidence, or else it should not be given, because such would tend to mislead the jury."). At resentencing, the defense pressed the medical examiner to admit that he did not see anything during the autopsy that indicated the wounds were not caused by "rapid repeated motions of the knife." No error occurred.

## G.

**¶47** Bocharski next asserts the court erred by failing to instruct the jury that only first-degree murders above the norm qualify for the death penalty. This Court reviews de novo whether jury instructions correctly state the law. *State ex rel. Thomas v. Granville (Baldwin)*, 211 Ariz. 468, 471 ¶ 8, 123 P.3d 662, 665 (2005). Bocharski did not request an "above the norm" instruction; therefore we review for fundamental error.

**¶48** Bocharski relies on language in *State v. Andriano* to argue that the court should have given an above the norm instruction. 215 Ariz. 497, 506 ¶ 43, 161 P.3d 540, 549 (2007). In *Andriano*, the defendant argued the trial court erred by instructing the jury that "the (F)(6) aggravating circumstance 'cannot be found to exist unless the murder is especially heinous, cruel or depraved, that is, where the circumstances of the murder raise it above the norm of other first degree murders.'" *Id.* ¶ 42. We found the court did not err in giving this instruction. *Id.* ¶ 43. We did not, however, direct that courts *must* provide such an instruction. *Id.*

21

¶49    *Andriano* relied on a statement in *State v. Carlson*, 202 Ariz. 570, 582 ¶ 45, 48 P.3d 1180, 1192 (2002), that "the death penalty should not be imposed in every capital murder case but, rather, it should be reserved for cases in which either the manner of the commission of the offense or the background of the defendant places the crime 'above the norm of first-degree murders.'" *Andriano*, 215 Ariz. at 506 ¶ 43, 161 P.3d at 549. In *Carlson*, we reasoned that to ensure reservation of the death penalty for those crimes above the norm of first-degree murders, the sentencing scheme "must narrow the class of persons to those for whom the sentence is justified." 202 Ariz. at 582 ¶ 45, 48 P.3d at 1192. We noted that statutory aggravators in Arizona's death penalty scheme narrow the class of first-degree murderers who are death eligible. *Id.*

¶50    Here, the jury found two aggravators proven beyond a reasonable doubt. Thus, the class of persons to which the death penalty may apply was constitutionally narrowed before the jury reached the penalty phase, making an above the norm instruction unnecessary.[11]

**H.**

---

[11]    We have previously rejected Bocharski's related argument that the jury should have been instructed to conduct a proportionality review. *See State v. Johnson*, 212 Ariz. 425, 431-32 ¶¶ 19-20, 133 P.3d 735, 741-42 (2006).

¶51     Bocharski contends that permitting the jury to hear victim impact evidence during the penalty phase of a death case violates the Eighth Amendment by infusing irrelevant emotion into the jury's consideration of mitigation evidence. *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), however, "removed the per se bar to the admission of victims' statements regarding the effect of a crime upon their lives." *Lynn v. Reinstein*, 205 Ariz. 186, 191 ¶ 16, 68 P.3d 412, 417 (2003). Under A.R.S. § 13-703.01.R, "the victim may present information about the murdered person and the impact of the murder on the victim and other family members and may submit a victim impact statement in any format to the trier of fact." Statements regarding impact on family members and information about the murdered person do not violate the Eighth Amendment because they are "relevant to the issue of the harm caused by the defendant." *Ellison*, 213 Ariz. at 140-41 ¶ 111, 140 P.3d at 923-24. Nevertheless, while victim impact evidence that focuses on the effect of the crime on the victim's family is generally admissible, it cannot be "so unduly prejudicial that it renders the trial fundamentally unfair." *Hampton*, 213 Ariz. at 181 ¶ 58, 140 P.3d at 964 (quoting *Payne*, 501 U.S. at 825).

¶52     Bocharski claims that the court erred by admitting the victim impact testimony provided by Brown's daughter because it lacked relevance to any mitigation and was unduly prejudicial.

23

"The admission of victim impact evidence is reviewed for abuse of discretion." *State v. Garza*, 216 Ariz. 56, 69 ¶ 60, 163 P.3d 1006, 1019 (2007).

¶53     The statements in this case properly focused on the impact of the crime on the victim's family and were not unduly prejudicial.  Moreover, the trial judge appropriately instructed the jurors that they could consider the victim impact statement only to rebut the mitigation evidence.  We find no error.

**I.**

¶54     Bocharski next asserts that the court erred by admitting stipulated testimony as rebuttal evidence.  We review a trial court's ruling on the admission of rebuttal evidence for an abuse of discretion.  *See Pandeli III*, 215 Ariz. at 527 ¶ 41, 161 P.3d at 570.

¶55     While awaiting trial, Bocharski was involved in an assault on Donald Fields, a fellow inmate in the Yavapai County jail.  *Bocharski I*, 200 Ariz. at 58 ¶ 35, 22 P.3d at 51.  Fields was inadvertently placed near a prisoner whom he had previously helped the police apprehend.  *Id.*  Fields testified that this prisoner and other inmates, including Bocharski, attacked him. *Id.*  In Bocharski's original trial, the judge admitted Fields' testimony in the form of a stipulation.  *Id.* ¶ 36.  The parties stipulated as follows:

24

Don Fields was arrested on January 15, 1996 for not paying a traffic ticket. He was taken to the Prescott Jail. By coincidence he was put in Jail with a person he helped to catch the previous September, 1995. This person had taken a lady's purse at Albertson's in Prescott and Mr. Fields had helped to catch him. The fact that Mr. Fields had helped to catch this person became generally known to the people in the jail cell.

Mr. Bocharski was in that jail area and he approached Mr. Fields. Mr. Bocharski told Mr. Fields, 'I'm in here for murder and there is nothing they can do to me, if it were up to me, you'd be dead right now.'

At a separate time, Mr. Bocharski told Mr. Fields, 'I'm in here for murder because of a snitch like you.'

Mr. Bocharski made these statements to Mr. Fields in a serious and threatening manner.

In 1997, Bocharski pled guilty to kidnapping and aggravated assault in connection with the Fields incident.

¶56 In its motion to present rebuttal evidence, the State argued that the Fields evidence was relevant to rebut the claim that Bocharski "snapped" and murdered Brown because the assault on Fields provided evidence of infliction of serious harm in a separate incident. The State also argued that the evidence rebutted the mitigating circumstance that Bocharski was intoxicated at the time of Brown's murder because the assault on Fields occurred while he was incarcerated and not under the influence of alcohol. Moreover, anticipating testimony by witnesses that Bocharski was kind and gentle, the State argued the Fields evidence could be admitted to rebut such claims. Bocharski disagreed with the State's arguments and further

25

asserted that the Fields evidence should not be admitted because the State lost a document that identified the witnesses to the Fields incident, making it difficult for Bocharski to investigate the statements made by those who witnessed the incident.

¶57 The trial judge concluded that the State "gets an opportunity to present the Fields information during the penalty phase." Due to the missing document, however, the trial judge held an evidentiary hearing to determine the proper scope of the evidence to be admitted.

¶58 After hearing testimony from the witnesses about the significance of the lost document, the trial judge ruled that, although the jury would be allowed to hear some of the Fields evidence, the State would be limited to explaining Bocharski's role in the incident. The defense continued to object to admission of the Fields evidence in any form, but argued that if the evidence were admitted, it should be limited to the evidence in the stipulation. The trial judge agreed and limited evidence of the Fields incident to the stipulation and the judgment of conviction.

## 1.

¶59 In the original appeal, we found that the portion of the stipulation that quoted Bocharski as stating, "if it were up to me, you'd be dead right now," was not relevant because it did not relate to the victim or the crime of which Bocharski was

accused. *Bocharski I*, 200 Ariz. at 58 ¶ 38, 22 P.3d at 51. We concluded that this statement was used to show Bocharski's propensity for violence, which was improper because he had not placed his character at issue. *Id.*

¶60     At resentencing, the trial court admitted the Fields stipulation as rebuttal evidence in the penalty phase, after finding that Bocharski's mitigation evidence placed his character for peacefulness at issue. Bocharski maintains that, based on this Court's ruling after the original trial, the Fields evidence was inadmissible under the "law of the case" doctrine. The "law of the case" is

> a rule of general application that the decision of an appellate court in a case is the law of that case on the points presented throughout all the subsequent proceedings in the case in both the trial and the appellate courts, and no question necessarily involved and decided on that appeal will be considered on a second appeal or writ of error in the same case, provided the facts and issues are substantially the same as those on which the first decision rested, and, according to some authorities, provided the decision is on the merits.

*State v. King*, 180 Ariz. 268, 278, 883 P.2d 1024, 1034 (1994) (quoting *In re Monaghan's Estate*, 71 Ariz. 334, 336, 227 P.2d 227, 228 (1951)).

¶61     The law of the case doctrine did not preclude admission of the Fields stipulation as rebuttal evidence because the issue at resentencing differed from that considered by this Court in the original appeal.

27

## 2.

¶62     Bocharski next contends that the Fields evidence does not meet the relevancy threshold for admissibility.  In *Hampton*, 213 Ariz. at 179 ¶ 47, 140 P.3d at 962, we observed that "[t]he only limit that § 13-703(C) places on the State's evidence at the penalty phase is that it must be 'relevant' to the issue of mitigation."  We cautioned, however, that "[t]rial courts can and should exclude evidence that is either irrelevant to the thrust of the defendant's mitigation or otherwise unfairly prejudicial." *Id.* at 180 ¶ 51, 140 P.3d at 963.

¶63     As the trial judge noted, Bocharski presented witnesses he knew during his childhood who described him as gentle, polite, well-mannered, and shy.  The thrust of this mitigation evidence was to show that Bocharski has a peaceful character.  The Fields stipulation rebutted this mitigation evidence and therefore was relevant to the issue of mitigation.

¶64     Moreover, the trial court limited the State to presenting evidence of Bocharski's role in the incident.  The probative value of the Fields stipulation was not substantially outweighed by the prejudicial nature of the evidence and therefore the trial court did not abuse its discretion in admitting the stipulation.  *See State v. McGill*, 213 Ariz. 147, 157 ¶ 40, 140 P.3d 930, 940 (2006) (stating that "the judge's analysis [of evidence under A.R.S. § 13-703] . . . involves

28

fundamentally the same considerations as does a relevancy determination under Arizona Rule of Evidence 401 or 403").

## 3.

¶65    Bocharski also asserts that the Fields stipulation was hearsay that he was not given the opportunity to rebut or explain.  In *State v. Greenway*, we recognized that due process requires that a capital defendant be given notice of any hearsay statement the state intends to introduce as rebuttal to mitigation.  170 Ariz. 155, 161, 823 P.2d 22, 28 (1991).  In addition, the defendant must have an "opportunity to either explain or deny" the hearsay statement.  *Id.*  The Due Process Clause also demands that hearsay statements "have sufficient indicia of reliability."  *McGill*, 213 Ariz. at 160 ¶ 56, 140 P.3d at 943.

¶66    More than a year before resentencing, the State gave Bocharski notice that it might introduce the Fields evidence, depending on the mitigation evidence presented at trial.  The State offered to have Fields testify in the penalty phase, but Bocharski's counsel specifically requested that if any Fields evidence were admitted, it be limited to the stipulated statement admitted in the original guilt trial.  If Fields had testified, Bocharski could have cross-examined him.  Bocharski therefore cannot complain about the use of the stipulation rather than live testimony.  In any event, Bocharski testified about the incident

29

**4.**

¶67     Bocharski further argues that his rights under the Confrontation Clause were violated by admission of this hearsay evidence.   The Confrontation Clause does not apply to hearsay used to rebut mitigation.   *See McGill*, 213 Ariz. at 159 ¶¶ 51-52, 140 P.3d at 942.

**5.**

¶68     Bocharski reasons that admission of this evidence without any chance of rebuttal violates the Eighth Amendment "by permitting uncontested evidence to be used to sentence a man to die."   This claim fails because the evidence contains sufficient indicia of reliability and Bocharski did have an opportunity to explain the incident.

**6.**

¶69     Finally, Bocharski alleges that the statutes and rules governing the admissibility of mitigation evidence violate due process and the Eighth Amendment because they allow the state to offer "any evidence," subject to a very minimal threshold of relevance, amounting to an unguided, vague aggravating circumstance.   We rejected a similar argument in *Hampton*, noting that A.R.S. §§ 13-703.01.G and 13-703.C contain "an express

30

relevance requirement, mandating that the State's evidence be relevant to the determination of whether there is mitigation that is sufficiently substantial to call for leniency." 213 Ariz. at 179 n.11 ¶ 47, 140 P.3d at 962 n.11 (internal quotation omitted). In addition, the jury was instructed at the conclusion of the penalty phase: "You may not consider any information presented during this phase of the trial as a new aggravating factor."

**J.**

¶70      Bocharski also argues the court abused its discretion by ruling that the admission of Bocharski's surrebuttal evidence would open the door to further rebuttal evidence by the State. We review the admission of surrebuttal evidence by the trial court for an abuse of discretion. *State v. Steelman*, 120 Ariz. 301, 319, 585 P.2d 1213, 1231 (1978).

¶71      The trial judge admitted a sanitized version of the Fields incident to allow the State to rebut testimony describing Bocharski's character as polite, well-mannered, and shy. After admitting the stipulation and a copy of the judgment of conviction in the Fields matter, the State rested in rebuttal. In surrebuttal, Bocharski moved to admit his Arizona Department of Corrections records and an expert's risk assessment report. The trial court stated that if these exhibits were admitted, the State would be permitted to present another witness or other

31

The defense then withdrew the proffered exhibits.

¶72     Bocharski maintains that the court's ruling permitting the State to introduce evidence in response to Bocharski's surrebuttal violated his constitutional rights by denying him the opportunity to present a complete defense.  This claim fails for several reasons.

¶73     First, the trial judge did not deny admission of Bocharski's surrebuttal exhibits; rather, the judge ruled the surrebuttal exhibits would themselves be subject to rebuttal and, after receiving this ruling, Bocharski elected to withdraw the exhibits.  Second, as conceded by Bocharski, his case-in-chief did not present any evidence related to his propensity for violence in an institution.  Thus, Bocharski's surrebuttal exhibits presented new mitigation evidence to show his lack of future dangerousness in an institution.  The trial court did not abuse its discretion by ruling that the State could rebut this new evidence.  *See State v. Talmadge*, 196 Ariz. 436, 440 ¶ 18, 999 P.2d 192, 196 (2000) ("Surrebuttal testimony may be offered

---

[12]     Bocharski contends that the trial court ruled that the State would be permitted to "offer in surrebuttal additional details of the 'Fields incident.'" The trial court, however, did not rule that additional details of the Fields incident would be admissible, but only that the State could admit evidence pertaining to the issue of future violence in an institution. The defense withdrew the surrebuttal exhibits before the court further defined the specific evidence the State could admit.

to introduce evidence in response to new rebuttal testimony or to impeach rebuttal testimony and must be more than cumulative.").

## K.

¶74    Bocharski contends he was deprived of his right to due process as a result of prosecutorial misconduct.  We will reverse a conviction because of prosecutorial misconduct if misconduct is present and "a reasonable likelihood exists that [it] could have affected the jury's verdict, thereby denying defendant a fair trial."  *Anderson*, 210 Ariz. at 340 ¶ 45, 111 P.3d at 382 (citation omitted).  When a defendant objects to an alleged act of prosecutorial misconduct, the issue is preserved; when a defendant fails to object, the Court engages in fundamental error review.  *See State v. Velazquez*, 216 Ariz. 300, 311 ¶ 47, 166 P.3d 91, 102 (2007).  Even if the alleged acts of misconduct do not individually warrant reversal, we must determine whether the acts "contribute to a finding of persistent and pervasive misconduct."  *State v. Roque*, 213 Ariz. 193, 228 ¶ 155, 141 P.3d 368, 403 (2006).  We will reverse a conviction because of prosecutorial misconduct if the cumulative effect of the alleged acts of misconduct "shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant."  *Id.* (citation and internal quotation omitted).

33

¶75    Our thorough review of the record discloses no action by the prosecutor that we regard as constituting misconduct. Absent any finding of misconduct, there can be no cumulative effect of misconduct sufficient to permeate the entire atmosphere of the trial with unfairness. *See State v. Hughes*, 193 Ariz. 72, 79 ¶ 26, 969 P.2d 1184, 1191 (1998) ("To determine whether prosecutorial misconduct permeates the entire atmosphere of the trial, the court necessarily has to recognize the cumulative effect of the *misconduct*." (emphasis added)).

## L.

¶76    Bocharski next contends that, in this particular case, applying Arizona's amended death penalty statutes violated the prohibition against ex post facto laws.    We review constitutional issues de novo.  *Pandeli III*, 215 Ariz. at 522 ¶ 11, 161 P.3d at 565.

¶77    In *State v. Ring* (*Ring III*), 204 Ariz. 534, 547 ¶ 23, 65 P.3d 915, 928 (2003), we held that "Arizona's change in the statutory method for imposing capital punishment is clearly procedural" and does "not resemble the type of after-the-fact legislative evil contemplated by contemporary understandings of the ex post facto doctrine."  Further, we held that the change did not deny capital defendants any substantial protections: "The new sentencing statutes do not place the defendants in jeopardy of any greater punishment" because the state must prove

34

beyond a reasonable doubt the same aggravating circumstances required by the former statute, the only difference being that a jury, instead of a judge, decides whether the state has proved its case. *Id.* ¶ 24.

¶**78**     Bocharski argues that the unique procedural posture of this case distinguishes it from *Ring III*. He asserts that he was deprived of previously available substantive protections in violation of the ex post facto prohibition because the jury was not directed, as were judges under the previous statute, to make special findings on aggravation and mitigation. We rejected this argument in *Ellison*, 213 Ariz. at 146-47 app. n.21, 140 P.3d at 929-30 app. n.21.

### III.

¶**79**     Bocharski's offense occurred before August 1, 2002, and therefore this Court independently reviews the aggravating and mitigating circumstances as well as the propriety of the death sentence. A.R.S. § 13-703.04. In conducting independent review, "we consider the quality and strength, not simply the number, of aggravating and mitigating factors." *Roque*, 213 Ariz. at 230 ¶ 166, 141 P.3d at 405 (citation and quotation omitted).

### A.

¶**80**     On remand, the jury found two aggravating factors proven beyond a reasonable doubt: The murder was committed in

35

an especially heinous or depraved manner, A.R.S. § 13-703.F.6,[13] and the defendant was an adult at the time of the offense and the victim was over the age of seventy years, A.R.S. § 13-703.F.9.  We address each in turn.

**1.**

¶81    The State relied upon the testimony of Dr. Dressler, who performed the autopsy on Brown, to support the F.6 aggravator.  At resentencing, Dr. Dressler used a chart to describe to the jury the injuries identified in the autopsy.  The chart noted seventeen incised wounds,[14] eight of which were deeper penetrating stab wounds in which the knife entered perpendicular to the surface.  With the exception of one small wound on Brown's right index finger, all the wounds were confined to the left side of Brown's head and face.  The doctor described one of the wounds as fatal.  This fatal wound entered near Brown's left ear and penetrated deep into the brain cavity, where it contacted the foramen magnum of the base of the skull and would have rendered Brown unconscious within seconds.  Within

---

[13]    The State conceded that it could not establish cruelty and thus asserted only the especially heinous and depraved prongs of F.6.

[14]    Dr. Dressler indicated that Bocharski inflicted at least twenty-four overlapping knife wounds.  He derived this larger number by adjusting for multiple penetrations in the same location.  In other words, while the doctor assigned each wound only one number on his chart, the shape of some wounds indicated the knife actually penetrated that location more than once.

four to five minutes after sustaining this injury, her brain would have become non-functional. Another deep penetrating wound entered the brain cavity and touched the base of the skull, but was not necessarily fatal or immediately incapacitating. Dr. Dressler described four other stab wounds that penetrated deep into the cheek muscle as not immediately fatal. Another stab wound broke Brown's nasal bone. Another eight wounds were caused by a slashing or slicing motion made when the knife was nearly parallel to the surface of Brown's skin.

¶82 Dr. Dressler stated on cross-examination that he suspected all the wounds occurred fairly close together, with "seconds, maybe minutes" between them. Upon further questioning, he testified that "more than likely" all the injuries were caused in less than one minute. Each of the wounds identified had associated blood in the tissue, meaning Brown's heart continued beating while they were inflicted. The doctor could not tell the order in which the wounds were inflicted, but testified that the fatal wound, which would have been instantly incapacitating, "probably" occurred early in the sequence.

¶83 "Heinousness and depravity refer to the mental state and attitude of the perpetrator as reflected in his words and actions." *State v. Jones*, 205 Ariz. 445, 449 ¶ 15, 72 P.3d 1264, 1268 (2003) (citation and internal quotation omitted); *see also State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983)

37

("[T]he statutory concepts of heinous and depraved involve a killer's vile state of mind at the time of the murder, as evidenced by the killer's actions."). In *Gretzler*, we identified five factors to consider in determining whether a killing was especially heinous or depraved: (1) relishing the murder, (2) infliction of gratuitous violence, (3) needless mutilation of the victim, (4) senselessness of the crime, and (5) helplessness of the victim. 135 Ariz. at 51-52, 659 P.2d at 10-11. The State argued that the evidence supported findings of mutilation and gratuitous violence.

¶84    We conclude that the State did not present sufficient evidence to support a finding of mutilation beyond a reasonable doubt. Mutilation requires an act separate and distinct from the killing itself, committed with the intent to mutilate the victim's corpse. *See Pandeli III*, 215 Ariz. at 523-24 ¶ 20, 161 P.3d at 566-67. The evidence here does not support a finding that Bocharski had a separate intent to mutilate. *See State v. Medina*, 193 Ariz. 504, 514 ¶ 38, 975 P.2d 94, 104 (1999) (finding mutilation not proven because evidence was not presented of a separate purpose to mutilate the body). The State argues that because some of the wounds were of a slashing or slicing nature, as opposed to deep penetrating stab wounds, and because Brown did not struggle during the attack, Bocharski intended to mutilate Brown's face. Those facts, however, differ substantially from

38

the acts we have previously regarded as sufficient to show mutilation. *See, e.g.*, *State v. Pandeli* (*Pandeli I*), 200 Ariz. 365, 376 ¶ 41, 26 P.3d 1136, 1147 (2001) (excising parts of the victim's breasts after her death); *State v. Vickers*, 129 Ariz. 506, 515, 633 P.2d 315, 324 (1981) (carving of word "Bonzai" in victim's back after killing him). The evidence also shows that none of the wounds occurred post-mortem. *Cf. State v. Jiminez*, 165 Ariz. 444, 455, 799 P.2d 785, 796 (1990) (numerous post-mortem stab wounds indicated needless mutilation). The evidence presented in this case simply does not establish, beyond a reasonable doubt, that Bocharski committed any separate and distinct acts with the intent to mutilate Brown's body.

¶85    While gratuitous violence presents a closer question, we conclude that the State did not present sufficient evidence to support a finding of gratuitous violence beyond a reasonable doubt. Although our prior cases have not been entirely consistent in describing the showing needed to establish gratuitous violence, we have defined several basic principles. Just as the mutilation factor focuses on the killer's intent to mutilate, *see Pandeli III*, 215 Ariz. at 523-24 ¶ 20, 161 P.3d at 566-67, so too does the gratuitous violence factor focus on the intent of the killer as evidenced by his actions.[15]    The fact

---

[15]    The third F.6 factor, especially cruel, also imposes an intent requirement. The State must show that the perpetrator

39

finder must consider the killer's intentional actions to determine whether he acted with the necessary vile state of mind. Before the fact finder considers the question of intent, however, the state must show that the defendant did, in fact, use violence beyond that necessary to kill.

¶86     Bocharski inflicted twenty-four knife wounds to the head and face of Brown, who was probably unconscious during most of those blows. *See State v. LaGrand*, 153 Ariz. 21, 36-37, 734 P.2d 563, 578-79 (1987) (finding gratuitous violence when a bound and gagged man was stabbed twenty-four times). Certainly Bocharski's blows involved considerable violence. *See State v. Salazar*, 173 Ariz. 399, 412, 844 P.2d 566, 579 (1992) (finding gratuitous violence when a fragile, partially blind 83-year-old woman was beaten and strangled so severely that she suffered a broken nose and crushed Adam's apple). We can infer that Bocharski did not need to inflict twenty-four knife injuries, including eight stab wounds that penetrated deep into Brown's face and head, to cause her death. Expert testimony established that the fatal blow "probably" occurred before additional blows were struck. Thus, the evidence supports the conclusion that Bocharski inflicted more violence than that necessary to kill.

---

"knew or should have known that the victim would suffer." *Tucker*, 215 Ariz. at 310-11 ¶¶ 31-33, 160 P.3d at 189-90.

¶87      That conclusion alone, however, does not support a finding of gratuitous violence.  The state must also show that the defendant continued to inflict violence *after he knew or should have known that a fatal action had occurred*.  *See Medina*, 193 Ariz. at 514 ¶ 36, 975 P.2d at 104 (finding gratuitous violence and distinguishing *State v. Richmond*, 180 Ariz. 573, 886 P.2d 1329 (1994), because in *Richmond* "there was no showing that the defendant knew or should have known the victim was dead after the first pass of the car"); *see also State v. Lee*, 189 Ariz. 608, 619, 944 P.2d 1222, 1233 (1997) (finding gratuitous violence when, after inflicting a wound to the head that was "unquestionably fatal," the defendant walked around the counter and shot the victim two more times); *State v. Jones*, 185 Ariz. 471, 488-89, 917 P.2d 200, 217-18 (1996) (finding gratuitous violence when the defendant, after inflicting two fatal blows, asphyxiated the victim).  A showing that a defendant continued to inflict violence after he knew or should have known that a fatal action had occurred provides essential evidence of the defendant's intent to inflict gratuitous violence.

¶88      The kinds of actions that this Court has previously found sufficient to show the necessary intent to support a finding of gratuitous violence are not present here.  The medical examiner testified that Brown's heart was beating when each of the wounds was inflicted, but speculated that the fatal wound

41

"probably" occurred early in the sequence of wounds because it would have caused Brown to lose consciousness very quickly and thus would explain both the absence of any struggle and why all the injuries occurred in the same general area on one side of her face. The doctor, however, expressed some uncertainty about when in the sequence the fatal wound occurred. *See State v. Lee*, 189 Ariz. 590, 605, 944 P.2d 1204, 1219 (1997) (finding that the evidence did not demonstrate violence beyond that necessary to kill when the record did not establish the time between the four gunshot wounds or the order in which the shots were fired); *State v. Lacy*, 187 Ariz. 340, 354, 929 P.2d 1288, 1302 (1996) (finding the record did not support a finding of gratuitous violence when the "medical testimony did not establish which of the three shots was fatal"). Such uncertainty about the timing of the fatal wound makes it difficult to conclude beyond a reasonable doubt that Bocharski knew or should have known that he had already struck a fatal wound yet continued to attack the victim.

¶89    Second, the examiner testified that the knife injuries occurred in quick succession and that all the injuries were likely inflicted within a minute. *Cf. State v. Sansing*, 206 Ariz. 232, 238 ¶ 20, 77 P.3d 30, 36 (2003) (finding gratuitous violence when the defendant killed the victim after a prolonged attack in which he struck the victim in the head with a club, dragged her into another room, raped her, and then stabbed her

several times); *State v. Hinchey*, 165 Ariz. 432, 439, 799 P.2d 352, 359 (1990) (finding gratuitous violence when after shooting the victim twice in the face, the defendant later returned and beat the victim over the head with a bottle and then went to the kitchen and got a knife and stabbed the victim several times). Such a sequence of events does not support the conclusion that Bocharski continued to injure Brown even though he knew or should have known that he had fatally wounded her.

¶90     Third, all the injuries in this case resulted from the means used to inflict death.  *See State v. Schackart*, 190 Ariz. 238, 249, 947 P.2d 315, 326 (1997) (finding evidence did not support gratuitous violence when the medical examiner concluded that the majority of the injuries were associated with the means of killing); *cf. Jones*, 205 Ariz. at 450 ¶ 17, 72 P.3d at 1269 (finding gratuitous violence when the victim suffered nine blows to the head, two stabbings in the throat, and multiple abrasions on the chest and face); *State v. Gulbrandson,* 184 Ariz. 46, 68, 906 P.2d 579, 601 (1995) (finding gratuitous violence when the defendant used several knives, scissors, and a wooden salad fork to attack the victim); *State v. Maturana*, 180 Ariz. 126, 132, 882 P.2d 933, 939 (1994) (finding gratuitous violence when, after the victim was shot twelve times, the defendants repeatedly hacked the body with a machete).  Because Bocharski used only a knife to inflict the wounds and completed his attack very rapidly, we find

it unlikely he knew or should have known he had inflicted a fatal wound but continued nonetheless to inflict more violence.

¶91       We cannot conclude from the evidence presented that Bocharski intentionally inflicted violence after he knew or should have known of a fatal occurrence; the State therefore did not establish gratuitous violence beyond a reasonable doubt.[16]

## 2.

¶92       The State presented sufficient evidence to prove the F.9 aggravator beyond a reasonable doubt.   Brown's daughter testified that her mother was eighty-four years old when she died, and the State admitted a birth certificate and death certificate indicating the same.   Bocharski was thirty-three years old at the time of the offense.   Based on our independent review, therefore, we conclude that the State established a single aggravating factor.

## B.

¶93       We turn next to the mitigating evidence.   A capital defendant may present any evidence during the penalty phase so long as it is relevant and "supports a sentence less than death." *Tucker*, 215 Ariz. at 322 ¶ 106, 160 P.3d at 201. The defendant

---

[16]   While the facts in this case support a finding that the victim was helpless and the murder was senseless, these factors alone cannot support a finding of heinous or depraved. *See State v. Cañez*, 202 Ariz. 133, 162 ¶ 109, 42 P.3d 564, 593 (2002) (finding that helplessness and senselessness alone are not enough).

44

must prove mitigating factors by a preponderance of the evidence. A.R.S. § 13-703.C.

¶94    Bocharski presented one statutory and six non-statutory mitigating circumstances: (1) A.R.S. § 13-703.G.1 (state of mind), (2) physical, mental, and sexual abuse of the defendant, (3) history of substance abuse and alcoholism, (4) dysfunctional family of origin including multigenerational violence, criminality, and substance, sexual, emotional, and physical abuse, (5) abandonment, severe neglect, starvation, and foster care placement, (6) impact of execution on the defendant's family, and (7) remorse.

**1.**

¶95    Section 13-703.G.1 instructs that we consider whether Bocharski's "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." Dr. Craig Beaver interviewed Bocharski and reviewed relevant records, including those gathered by the mitigation specialist. Dr. Beaver opined that Bocharski was severely abused emotionally, physically, and sexually as a child and that he never had an opportunity for normal growth and development. He also stated that the forcible rapes and beatings by Chuck Below, with whom Bocharski lived during his teenage years, caused significant emotional trauma, particularly because

45

Below was one of the only adults who had ever provided for Bocharski. Moreover, he explained, Bocharski was "given no resources to cope and deal effectively with the severity of abuse and neglect that he suffered throughout his upbringing." Dr. Beaver testified that Bocharski suffered from many of the elements of post-traumatic stress disorder, caused not only by his early childhood experiences, but particularly by his relationship with Below.

¶96 Next, Dr. Beaver discussed the multigenerational history of severe alcohol abuse in the Bocharski family; Bocharski's parents were severe alcoholics, as were his grandparents. Bocharski was exposed to alcohol at a very young age and drank alcohol regularly by the time he was in his late teens. Bocharski married in his early twenties and had three children, but his abuse of alcohol eventually ended the relationship. Dr. Beaver opined that Bocharski's mental state continued to deteriorate over time, "given his lack of psychological resources,[17] appropriate psychosocial supports,[18] and his worsening alcoholism," and that "when [Bocharski] moved

---

[17] Dr. Beaver testified that psychological resources refers to those normal resources a person has within himself to cope and that Bocharski lacked such resources due to his background and upbringing.

[18] Psychosocial supports refers to those one has in his community to support him and give direction.

46

to Arizona in 1994, he was at the end of his tether." Dr. Beaver also testified that, in his opinion, Bocharski was "pretty depressed" at the time of the offense.

¶97     Dr. Beaver stated that a person like Bocharski, in a depressed and inebriated state,[19] would have been much more limited than most people in his ability to control and manage his feelings and reactions. In correspondence admitted into evidence, Dr. Beaver stated, "[T]here is evidence to suggest that Phillip Bocharski's emotional and alcoholic condition around the time of Freeda Brown's murder affected not only his interactions with the investigating police, but likely played a substantial role in the events that led to his arrest for the murder of Freeda Brown." The doctor also noted that Bocharski was concerned with the way Brown treated her animals and that, during his childhood, Bocharski experienced a traumatic event when an uncle killed his pet hamsters. Finally, the doctor testified that people suffering from post-traumatic stress disorder tend to lack the ability to control their impulses in very emotional or highly charged situations and that alcohol significantly adds to this limitation.

---

[19]    Several witnesses corroborated Bocharski's testimony that he was very intoxicated on the day of the murder. Towell testified that he and Bocharski drank beer at his campsite on the day of the murder. Sukis verified that he and Bocharski stopped at the Arrowhead Bar on the night of the murder and that Bocharski ordered bourbon and coke and then a pint of whiskey.

¶98     Although Dr. Beaver's testimony suggests that Bocharski's ability to conform his conduct to the requirements of law was impaired, his testimony does not support a conclusion that Bocharski was *significantly* impaired as required by A.R.S. § 13-703.G.1.

¶99     Furthermore, although voluntary intoxication or substance abuse can be a mitigating factor that supports a G.1 finding, "a defendant's claim of alcohol or drug impairment fails when there is evidence that the defendant took steps to avoid prosecution shortly after the murder, or when it appears that intoxication did not overwhelm the defendant's ability to control his physical behavior." *State v. Rienhardt*, 190 Ariz. 579, 591-92, 951 P.2d 454, 466-67 (1997).  Bocharski testified that after he stabbed Brown he wanted to cover up the crime so he considered burning the trailer and then stole money from Brown's purse to make it look like a robbery.  Bocharski also locked the door of the trailer before leaving.  The next morning, he lied about the source of the money.

¶100    We conclude that Bocharski did not prove this statutory mitigating factor by a preponderance of the evidence.  Nonetheless, we will consider Bocharski's abuse, neglect, and intoxication as non-statutory mitigating circumstances.

**2.**

48

¶101    Testimony from numerous witnesses supports the conclusion that Bocharski suffered severe physical, mental, and sexual abuse during his childhood.  Bocharski's sister, Carol Ann, testified that Bocharski's mother, Mary Rose, beat him frequently: "She'd cuff him in the head, used boards on him, she used electric cords, she used hot wheel race tracks.  Belts, mirrors, brushes."  She also testified that Bocharski's uncle, who lived with them for a time, beat Bocharski frequently and was "always picking on Phillip and smacking him around."  Also, around the age of twelve, Bocharski's family moved in with his mother's cousin.  According to Mary Rose, her cousin, a convicted child molester, later admitted that he had sexually molested Bocharski.

¶102    When Bocharski was a young teenager, his mother sent him to live with Chuck Below and, according to some accounts, accepted money from Below in return for her son.  Bocharski lived and traveled with Below, a long-distance trucker.  The mitigation specialist interviewed Below in prison, where he was serving a fifty-year sentence for multiple child molestation convictions. During the interview, Below admitted that he beat Bocharski often and forcibly raped him for several years.  The evidence established that Bocharski suffered extreme physical, mental, and sexual abuse by a preponderance of the evidence.

**3.**

¶103    Bocharski stated that he began drinking alcohol around the age of ten and that his drinking increased until he drank regularly on the weekends by age sixteen.  Bocharski's wife described him as a serious alcoholic "who drinks until he blacks out."  Further, several of Bocharski's acquaintances testified that, around the time of Brown's murder, Bocharski was consuming "a lot of alcohol."  As detailed above, Bocharski apparently consumed a significant amount of alcohol on the day he murdered Brown.  Thus, a preponderance of the evidence supports the conclusion that Bocharski had a history of alcohol abuse and was intoxicated at the time of the crime.

**4.**

¶104    As Dr. Beaver testified, Bocharski came from a severely dysfunctional family.  The record includes evidence of multigenerational violence in both his mother's and father's families.  Bocharski's father engaged in several significant incidents of violence, including one in which he threatened to shoot his own mother and another in which he kidnapped and held two state troopers at gunpoint.  Bocharski's mother testified that her parents beat her and that she was molested by her brothers when she was young, resulting in a pregnancy and attempted suicide.  The multigenerational history also includes severe alcohol abuse; Bocharski's parents were both alcoholics,

50

as were their parents.  By a preponderance of the evidence, Bocharski proved a severely dysfunctional family of origin.

**5.**

¶105    Bocharski also presented extensive evidence of abandonment and neglect.  Bocharski's father left shortly after his birth and denies that Bocharski is his son.  Several witnesses testified that Bocharski's mother frequently inflicted violence on her children and was extraordinarily neglectful.  Bocharski's sister testified that their mother left them alone for days without food and constantly brought new sexual partners into the home.  A neighbor reported seeing Bocharski and his sister rummaging through garbage cans looking for food during the winter in New York.  For a time, the children lived with a motorcycle group in New York, where Bocharski and his sister were exposed to drugs, sex, and filthy living conditions.  A Children's Services Division caseworker in New York filed a petition charging Bocharski's mother with "neglect of her children in that she had failed to provide food, education, and medical care, although financially able to do so."  This petition resulted in the placement of Bocharski and his sister in foster care for the second time.  Considering whether to return the children to their mother, the caseworker stated:

> [T]hese children were the most seriously neglected children I have placed in a long time.  I still have some pangs of conscience for letting these children

51

> suffer the emotional stress of much drinking, fighting, poor supervision, and open immoral conduct for as long as I did before I acted.
> Besides this these children were really hungry, and it was an amazement to them when they were first placed with the [foster family] that they could have all they wanted to eat at night and still have enough left for morning.

Bocharski lived in foster care for approximately two years and then returned to his mother's care. After a few years, she sent him to live with Below, who physically and sexually abused him. Bocharski proved this mitigating factor by a preponderance of the evidence.

**6.**

¶106       "The existence of family ties is a mitigating factor." *McGill*, 213 Ariz. at 162 ¶ 67, 140 P.3d at 945. Carol Ann, Bocharski's sister who lost contact with him after he moved in with Below, testified that she wants "[m]ore than anything" to develop a relationship with her brother and is corresponding with him. Also, letters written by each of Bocharski's children were submitted into evidence; they express love for their father. "The love of a defendant's family is mitigating evidence," *Ellison*, 213 Ariz. at 145 ¶ 142, 140 P.3d at 928, and Bocharski established this factor.

**7.**

52

¶107    Bocharski also established his remorse, which can serve as a mitigating factor.  *Medina*, 193 Ariz. at 516 ¶ 52, 975 P.2d at 106.  He made the following statement at the penalty phase:

> I would like to say to Freeda Brown's family that I am sorry for the pain that I have caused your family by taking the life of someone you love so dearly.  If I could change one night of my life, it would be the night that I took Freeda's life.  If I could give up my life so Freeda could live again, I would gladly do that.  She didn't deserve to die and I truly am sorry for the pain and the grief I have caused your family.

Mary Durand, the mitigation specialist, testified that Bocharski expressed remorse for murdering Brown and attempted to write a letter to Brown's closest friends.

## C.

¶108    As described above, the trial judge concluded that Bocharski presented evidence of a peaceful character and allowed the State to rebut this evidence with the Fields stipulation and judgment of conviction.  The State read the Fields stipulation into evidence and informed the jury that Bocharski had been convicted of aggravated assault, a class-three felony, with a dangerous instrument, and kidnapping, a class-two felony, dangerous, pursuant to A.R.S. § 13-604, as a result of the Fields incident.  Both exhibits were admitted into evidence.

## D.

¶109    Many criminal defendants present mitigation evidence of a less-than-ideal life, but Bocharski's mitigation evidence is

unique in its depth and breadth. The evidence in the record demonstrates severe neglect, as well as almost unimaginable mental, physical, sexual, and emotional abuse throughout his childhood. The record also reveals Bocharski's history of alcohol abuse and intoxication at the time of the crime. Finally, he established the impact of execution on his family and his remorse.

¶110     Although a "difficult family background, in and of itself, is not a mitigating circumstance sufficient to mandate leniency in every capital case," we can consider both the degree to which a defendant suffered as a child and the strength of a causal connection between the mitigating factors and the crime "in assessing the quality and strength of the mitigation evidence." *Hampton*, 213 Ariz. at 185 ¶ 89, 140 P.3d at 968 (citation and internal quotation omitted). Here, we have evidence of a causal connection. Dr. Beaver testified that Bocharski's troubled upbringing helped cause the murder of Brown: He testified that Bocharski's emotional and alcoholic state likely played a substantial role in the events that led to the murder of Brown and that a person in his state would have been far less able than others to control and manage his feelings and reactions.

¶111     Several factors cause us to give somewhat less weight to some of the mitigation evidence presented. First, Bocharski's

actions immediately following the crime constituted purposeful steps to avoid prosecution and therefore his claim of alcohol impairment is diminished. *See Rienhardt*, 190 Ariz. at 591-92, 951 P.2d at 466-67. Also, Bocharski committed this offense when he was thirty-three years old, lessening the relevance of abuse and neglect that occurred during his childhood. *See Hampton*, 213 Ariz. at 185 ¶ 89, 140 P.3d at 968; *Anderson*, 210 Ariz. at 357 ¶ 136, 111 P.3d at 399.

**E.**

**¶112** To determine whether the mitigation evidence is sufficiently substantial to call for leniency, we evaluate the strength of both aggravating and mitigating factors. The aggravation, absent the F.6 aggravator, is not particularly strong. The State established only the F.9 aggravator, age of the victim, beyond a reasonable doubt. The mitigation evidence, in contrast, is substantial. Given the limited aggravation evidence and the strong mitigation evidence, we doubt whether death is warranted in this case. "When there is a doubt whether the death sentence should be imposed, we will resolve that doubt in favor of a life sentence." *Roque*, 213 Ariz. at 231 ¶ 170, 141

P.3d at 406 (citation and internal quotation omitted).  We do so here.[20]

**IV.**

**¶113**    We reduce defendant's sentence of death to natural life imprisonment without the possibility of release.[21]  *See* A.R.S. §§ 13-703.A, -703.04.B.


_____
        Ruth V. McGregor, Chief Justice

CONCURRING:


_____
Rebecca White Berch, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
Andrew D. Hurwitz, Justice


_____
W. Scott Bales, Justice

---

[20]    Bocharski raised nineteen additional issues to avoid preclusion.  Because we vacate Bocharski's death sentence, these issues are moot.

[21]    Bocharski also raised a number of additional issues on appeal, which we do not address because they are no longer relevant in light of the Court's conclusion in this case.